UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SHAUNCY CLAUD,

        Plaintiff,

                               Index No.: 2:18-cv-01390-DRH-AKT

   -against-

BROWN HARRIS STEVENS OF          **ORAL ARGUMENT REQUESTED**
THE HAMPTONS, LLC,

        Defendant.
------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Law Offices of G. Oliver Koppell & Associates
Attorneys for Plaintiffs
99 Park Ave., Suite 1100
New York, New York 10016
212-867-3838

i

# TABLE OF CONTENTS

Page

Table of Contents                                                                                          i

Table of Authorities                                                                                      iii

Preliminary Statement                                                                                    1

Statement of Facts                                                                                          2

      A.    Plaintiff's Background and Hiring                                         2

      B.    Plaintiff is Discriminated Against by Nelson                            3

      C.    Plaintiff Meets with Comnas to Address Nelson's               5
           Discriminatory Conduct

      D.    Plaintiff is Arrested                                                          6

      E.    Defendant Fabricates a Dispute to Justify Terminating      7
           Plaintiff

      F.    Plaintiff is Terminated by Defendant                             13

Argument                                                                                                    13

I.     Standard of Review                                                                13

II.    Plaintiff Has Properly Pled a Violation of 42 U.S.C. §1981           14

III.   Plaintiff Has raised Sufficient Questions of Fact to Warrant      16
      Denial of Summary Judgment

      A.    The McDonnell-Douglas Framework Governs Plaintiff's    16
           Claims

      B.    Defendant Does Not Challenge Plaintiff's Prima Facie Case   17

      C.    The Reason Proffered by Defendant for Plaintiff's              19
           Termination is Pretext and Racial Discrimination is the Real
           Reason

IV.   Plaintiff Has Sufficient Evidence to Sustain Her Burden of Proof at   25
      Trial

Conclusion                                                                                              25

**<u>TABLE OF AUTHORITIES</u>**

<u>Federal Cases</u>                                                                                           <u>Page</u>

Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456 (2d Cir. 2001)                          17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)                                       13, 14

Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067 (2d Cir. 1993)                                   13

Beyer v. County of Nassau, 524 F.3d 160 (2d Cir. 2008)                                       24

Brady v. Town of Colchester, 863 F.2d 205 (2d Cir. 1988)                                     14

Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000)                                        15

Byrnie v. Town of Cromwell, 243 F.3d 93 (2d Cir. 2001)                                       17

Chertkova v. Conn. Gen'l Life Ins. Co., 92 F.3d 81 (2d Cir. 1996)                           13

Claudio v. Mattituck–Cutchogue Union Free Sch. Dist., 955 F.Supp.2d 118                      20
    (E.D.N.Y. 2013)

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033 (2d Cir. 1993)                                 22

Cronin v. Aetna Life Ins. Co., 46 F.3d 196 (2d Cir. 1995)                                    21

Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174 (2d Cir. 1990)                     13

Devlin v. Transp. Communications Intern. Union, 2002 WL 413919                               18
    (S.D.N.Y. Mar. 14, 2002)

Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006)                                        16

Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities,              21
    115 F.3d 116 (2d Cir. 1997)

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219 (2d Cir. 1994)             20

Gottlieb v. Cnty. of Orange, 84 F.3d 511 (2d Cir. 1996)                                      14

Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111 (2d Cir. 2000)                                21

Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000)                                     23, 25

Hamilton v. Mount Sinai Hosp., 528 F.Supp.2d 431 (S.D.N.Y. 2007)                             18

Henry v. Daytop Village, Inc., 42 F.3d 89 (2d Cir. 1994)                                    23

Holcomb v. Iona College, 521, F.3d 130 (2d Cir. 2008)                                      19

Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2d Cir. 2001)                               21

Howard v. MTA Metro–North Commuter R.R., 866 F.Supp.2d 196 (S.D.N.Y. 2011)                17

Juarez v. Nw. Mut. Life Ins. Co., 69 F. Supp. 3d 364 (S.D.N.Y. 2014)                       15

Lanahan v. Mut. Life Ins. Co. of New York, 15 F.Supp.2d 381 (S.D.N.Y. 1998)               18

Lapsley v. Columbia University–College of Physicians & Surgeons,                          18
     999 F.Supp. 506 (S.D.N.Y. 1998)

Little v. NBC, 210 F.Supp.2d 330 (S.D.N.Y. 2002)

Littlejohn v. City of New York, 795 F.3d 297 (2d Cir. 2015)                                16

Mario v. P & C Food Markets, Inc., 313 F.3d 758 (2d Cir. 2002)                             17

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)                    14

Meiri v. Dacon, 759 F.2d 989 (2d Cir .1985)                                                20

Morales v. Rooney, 509 Fed.Appx. 9 (2d Cir. 2013)                                          16

Morris v. Ales Grp. USA, Inc., 2007 WL 1893729 (S.D.N.Y. June 29, 2007)                    18

Norville v. Staten Island Univ. Hosp., 196 F.3d 89 (2d Cir. 1999)                          17

Petterson v. State University of New York at Stony Brook, 2019 WL 367840,                  13
     (E.D.N.Y. Jan. 30, 2019) (DRH)

Pickett v. RTS Helicopter, 128 F.3d 925 (5th Cir. 1997)                                    14

Ramseur v. Chase Manhattan Bank, 865 F.2d 460 (2d Cir. 1989)                               20

Randolph v. CIBC World Markets, 2005 WL 704804 (S.D.N.Y. March 29, 2005)                   23

Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170 (2d Cir. 1996)                             22

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)                            17, 20

Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001)                                    18

Rosen v. Thornburgh, 928 F.2d 528 (2d Cir. 1991)                                                20

Rule v. Brine, Inc., 85 F.3d 1002 (2d Cir. 1996)                                               13

Santos v. Costco Wholesale, Inc., 271 F.Supp.2d 565 (S.D.N.Y. 2003)                            18

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997)                                           19

Shannon v. Fireman's Fund Ins. Co., 156 F.Supp.2d 2791 (S.D.N.Y. 2001)                         20

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)                                                 18

Turner v. National R.R. Passenger Corp., 181 F.Supp.2d 122 (N.D.N.Y. 2002)                     22

Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996)                               19

Viola v. Philips Med. SYS. of N. Am., 42 F.3d 712 (2d Cir. 1994)                               13

Williams v. R.H. Donnelley, Corp., 368 F.3d 123 (2d Cir. 2004)                                 24

Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376 (2d Cir. 2001)                         17

Federal Statutes

42 U.S.C. §1981                                                                                Passim

42 U.S.C. §1983                                                                                16, 19

Federal Rules

Rule 56                                                                                        13, 14

<u>PRELIMINARY STATEMENT</u>

Plaintiff Shauncy Claud ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion for summary judgment of defendant Brown Harris Stevens of the Hamptons, LLC ("Defendant").

Plaintiff was a real estate sales agent for Defendant who was fired because she is African-American.  She was the only African-American sales agent employed by Defendant.  While working for Defendant, Plaintiff was treated differently from white agents, not getting the support she needed from her supervisor and not getting credit for the work that she had done.  Plaintiff was also denied opportunities to generate new business.  About two weeks after Plaintiff complained about this mistreatment, Plaintiff was fired.  Plaintiff was also fired only one week after a newspaper article regarding a minor arrest of hers is published.  Other white agents were not fired after they were arrested.  Defendant's racism is so embedded that they said that would have to change the locks after Plaintiff was terminated because she could commit violence or destruction, unlike the white agents.  All of this evidence demonstrates that the termination of Plaintiff was motivated, at least in part, by discrimination.

Instead of discriminatory action, Defendant would have this Court believe that one uncorroborated complaint, from an individual who was not actually a client of Defendant, was all it took for them to fire Plaintiff.  However, the evidence is clear that this phone call did not take place.  As is discussed below, it is implausible for the alleged complainant to have spoken to the person that it is claimed they complained to.  Also, rhe timeline for the call is contradicted by the documentary evidence.  The actual client of Defendant, the mother of the alleged complainant and the owner of the property at issue, remained friends with Plaintiff and attempted to continue to utilize Plaintiff's services as sales agent.  Defendant also did not speak to Plaintiff about the

1

complaint, nor were details obtained from the alleged complainant about what actually took place during the incident that led to the complaint, rendering the facts of the complaint highly suspect, if it even took place at all.  The lack of credibility of this excuse necessitates a finding of pretext, and the denial of summary judgment.

Defendant's further argument in favor of dismissal should be given no weight.  Plaintiff has satisfied the pleading obligations of 42 U.S.C. §1981.  Defendant's actions in discriminating against the Plaintiff interfered with Plaintiff's performance under the terms of the contract, and prevented Plaintiff from enjoying all of the benefits of the contract. Such activity represents a violation of the literal language of the statute.  Defendant's contrary argument rests solely on a misrepresentation of Supreme Court precedent.

For all of the foregoing reasons, Defendant's motion for summary judgment must be denied.

<u>STATEMENT OF FACTS</u>

A.     <u>Plaintiff's Background and Hiring</u>

Plaintiff is a licensed real estate salesperson.  Ex. 1 at 6:12-14.  Plaintiff's first experience in real estate was in November 2014 when she worked for Town & Country real estate as a salesperson.  Ex. 1 at 13:19-15:5.  That employment ended in November, 2016 when she began to work for Defendant.  *Id*.  Plaintiff is African-American.  Ex. 2 at 30:11-13.

Plaintiff was hired by Defendant as a real estate salesperson in November, 2016.  Ex. 1 at 17:18-18:6; Exhibit A.  When she was hired Plaintiff was promised a fifty percent split of all commissions, and was told agents averaged around $150,000 per year in commissions.  Ex. 1 at 23:13-24:13.  Plaintiff's home office was in Southampton.  Ex. 1 at 60:16-23.  Plaintiff's immediate supervisor was Robert Nelson, the Senior Managing Director of Defendant.  Ex. 1 at

2

61:13-15. Ex. 2 at 28:7-11. Cia Comnas, the Executive Managing Director of Defendant, worked out of Bridgehampton and East Hampton and was a more senior person who Plaintiff did not see regularly, but consulted with on questions or issues. Ex. 1 at 62:3-64:25. Ex. 2 27:5-28:9.

Plaintiff was liked by her clients. Reginald Morris, a former client of Plaintiff while she was employed by Defendant, stated that he found Plaintiff to be pleasant and professional, and that she obtained a substantial offer for him. Ex. 10 ¶4. Mr. Morris stated that the subsequent agent assigned to represent him by Defendant did not do as good a job as Plaintiff, and that he would prefer it if Plaintiff represented him again. Ex. 10 ¶¶5-7. Similarly, as discussed below, another client of Plaintiff Cassandra Ham-Brown ("Ms. Brown") also sought to continue to be represented by Plaintiff following her termination from Defendant. Ex. 7. Despite the obstacles presented to her, Plaintiff generated in excess of $8,000 in commissions for both her and Defendant in her seven months of employment by Defendant. Comnas Dec. ¶7. Defendant concedes that Plaintiff was not terminated for issues related to her performance as a real estate salesperson. Ex. 11 at Interrogatory No. 9. Indeed, at the time of her termination, Plaintiff had multiple open listings and exclusive right to sell agreements for a variety of properties that could have earned her substantial commissions. Ex. 12 at iii; Ex. 1 at 277:13-279:12.

B.     Plaintiff is Discriminated Against by Nelson

Throughout Plaintiff's tenure at Defendant, she was repeatedly subject to discrimination by Mr. Nelson. Mr. Nelson said to Plaintiff, in a not nice tone of voice, that she was the only black agent in the Hamptons. Ex. 1 at 228:25-231:4

Consistent with the fact that Plaintiff was the only black agent, Mr. Nelson treated her differently than other Caucasian agents. Mr. Nelson never gave Plaintiff any support by accompanying Plaintiff to sales pitch meetings like managers are supposed to. Ex. 1 at 188:11-

22.  Ex. 2 at 28:12-24.  Because Mr. Nelson would not accompany Plaintiff to sales pitch meetings, Plaintiff had to ask other senior agents to accompany her.  Ex. 1 at 190:13-191:7.  Mr. Nelson did accompany white agents to sales pitch meetings.  Ex. 1 at 195:20-22.  Moreover, as is more fully discussed below, Mr. Nelson actually left Plaintiff and a prospective client in the middle of a sales pitch meeting.

On another occasion, Mr. Nelson also refused to meet with Plaintiff when Plaintiff first brought to Defendant the exclusive listing on a substantial property.  Ex. 1 at 238:7-239:20. Subsequently, when Plaintiff asked Mr. Nelson to accompany her to a client meeting with that client so that the client could meet a member of Defendant's management and a price reduction could be discussed, Mr. Nelson said to just send the client a letter.  Ex. 1 at 235:25-236:13.  Another agent had to accompany Plaintiff to the meeting instead.  Exhibit 1 at 236:14-237:2.  Indeed, another agent told Plaintiff Mr. Nelson should be helping her as he was doing with other agents, all of whom were white.  Ex. 1 at 239:24-243:25.

Mr. Nelson also refused to answer questions posited to him by Plaintiff.  On one occasion when Plaintiff asked Mr. Nelson for assistance in preparing "comps" for a particular property he told her to Google or YouTube her questions.  Ex. 1 at 232:22-234:17.

In addition, Mr. Nelson also excluded Plaintiff from the Up-Board, a form of lead generation for persons who either call or walk into Defendant's office and are interested in buying, selling or renting real estate.  Ex. 1 at 196:15-198:4.  Agents such as Plaintiff who know the inventory, come into the office regularly, know the market and have some experience are usually included on the Up-Board.  Ex. 1 at 199:5-200:9.  Ex. 2 at 36:21-37:16.  However, the President of Defendant confirmed to Plaintiff that she was not listed on the Up-Board.  Ex. 1 at 203:10-23; 205:23-206:8.  Mr. Nelson was responsible for maintaining the Up-Board.  Ex. 1 at 202:21-203:2.

Ex. 2 at 42:3-10.  According to Ms. Comnas, it was Mr. Nelson's decision as to whether he was "comfortable" with his agent to determine whether or not they should be placed on the Up-Board. Ex. 2 at 45:2-8.  The President of Defendant repeatedly said he would speak to Mr. Nelson about listing Plaintiff on the Up-Board, but Plaintiff was never added to the Up-Board.  Ex. 1 at 205:23-213:21.  Other Caucasian agents were included on the Up-Board.  Ex. 1 at 218:4-11.

Mr. Nelson also refused to give Plaintiff credit for work she had done in updating listings to the current pricing and availability.  Ex. 1 at 220:20-226:22.

C.      Plaintiff Meets with Comnas to Address Nelson's Discriminatory Conduct

On or about June 14, 2017, Plaintiff met with Comnas at the Southampton office at Plaintiff's request.  Ex. 1 at 65:2-66:11.  During that meeting, Plaintiff told Comnas that Nelson made her uncomfortable because of her race and that he treats her differently than other non-African-American salespersons.  Ex. 1 at 32:24-33:7; 37:9-18, 67:24-68:5.

In that meeting, Plaintiff specifically referred to an incident when in the middle of a sales pitch meeting with a homeowner in order to obtain the listing, Mr. Nelson left the meeting.  Ex. 1 at 68:5-12; 183:23-184:12.  Because of Mr. Nelson's departure, Plaintiff did not get the listing. Ex 1 at 68:5-12, 183:23-184:12.  It was unprofessional for Mr. Nelson to get up and leave in the middle of a meeting like that.  Ex. 1 at 185:22-188:10.  Mr. Nelson just put on his coat and left the meeting despite being specifically asked by Plaintiff to stay at the meeting.  *Id*.

Comnas looked shocked in response to Plaintiff's complaint of discrimination, and promised Plaintiff that she (Comnas) would provide Plaintiff with the support that Plaintiff was not receiving from Nelson.  Ex. 1 at 77:16-78:6.  Comnas suggested that Plaintiff meet with her at another time in Comnas' office and come up with a plan.  *Id*.  Despite this fact, the next communication Claud received from Comnas was Claud's termination.  Ex. 1 at 79:9-17.

Plaintiff was fired approximately two weeks after making this complaint regarding Mr. Nelson's conduct. Notably, Defendant denies that this meeting ever took place. Ex. 2 at 46:16-49:3. During the entirety of Comnas tenure at Defendant, Plaintiff was the only African-American sales agent. Ex. 2 at 30:23-31:5.

D.      Plaintiff is Arrested

A few days after the meeting with Comnas, Plaintiff was arrested. Plaintiff was arrested on June 17th or 18th, 2017 for knocking over a tip jar at a restaurant. Ex. 1 at 37:22-40:16. Plaintiff knocked the tip jar over because Plaintiff and her companion were being intentionally ignored by the restaurant staff. Ex. 1 at 37:22-40:16. As a result of the arrest, Plaintiff pled guilty to a violation, the record of which has since been sealed. Ex. 1 at 44:4-46:15.

The Southampton Press ran an article concerning Plaintiff's arrest. Ex. 1 at 46:18-25. The article came out on June 23, 2017, a week prior to Plaintiff's termination. Ex. 1 at 47:5-12. Copies of the newspaper were available at the offices of Defendant. Ex. 1 at 47:13-15. After being made aware of the upcoming article, as a preemptive measure, Plaintiff emailed Mr. Nelson and others at Defendant informing them about the arrest and the forthcoming article. Ex. 1 at 47:16-48:9. Ex. 3.. Plaintiff received no response. Ex. 1 at 47:16-48:9. Other real estate sales people employed by Defendant saw the article about the arrest and discussed it with Plaintiff. Ex. 1 at 48:20-51:11.

Despite the media coverage, Plaintiff's email and the fact other employees of Defendant were aware of Plaintiff's arrest, Defendant claims to have been unaware of Plaintiff's arrest at the time of Plaintiff's termination. Ex. 2 at 58:22-60:22. This is false. Comnas admitted that she and Nelson discussed the email sent by Plaintiff to Nelson discussing Plaintiff's arrest, though she denied they knew what the email was talking about and said they conducted no follow-up regarding

6

it.  Ex. 2 at 65:12-66:18.  Incredibly, Defendant also claims to be unaware of the arrest of two other Caucasian agents during their employment, who were not fired by Defendant.  Ex. 2 at 62:21-64:5.

Even Defendant's own employees did not agree with this story.  After her termination, an employee of Defendant again called the Plaintiff and told Plaintiff that it was cruel that Plaintiff was terminated by Defendant because of her arrest.  Ex. 1 at 51:12-54:9.  Moreover, Defendant informed other real estate companies, including Plaintiff's supervisor with Nest Seekers, that Plaintiff was terminated because of her arrest.  Ex. 1 at 301:10-306:23.

That Defendant fired Plaintiff based on her race and arrest is further buttressed by the fact that in email correspondence, Defendant claimed they had to change the locks to the office because Plaintiff could break in and do damage after her termination.  Ex. 2 at 81:25-82:13.  Ex. 4.  Plaintiff had never committed any violence during her tenure at Defendant, and even the alleged confrontation that Defendant says led to her discharge was solely verbal.  When white agents were no longer employed by Defendant the locks were not changed, Ex. 1 at 308:6-312:20, rendering the inescapable conclusion that Defendant believed that it was only the African-American agent that was more likely to break things.  While Defendant claims to have changed locks on other occasions when employees left the firm, Ex. 2 at 83:5-15, this is unsupported by any evidence.

E.      Defendant Fabricates a Dispute to Justify Terminating Plaintiff

In an effort to justify their termination of Plaintiff as not being based on her race, Defendant alleges a complaint form an individual who was not a client of Defendant to justify the termination of Plaintiff.

Plaintiff became aware of a potential client, Cassandra Ham-Brown, through Ms. Brown's nephew, who was good friends with Plaintiff and her family.  Ex. 1 at 92:12-22.  Ms. Brown owned a property at 300 Moses Lane in Southampton.  Ex.1 at 92:12-14.  Plaintiff and Ms. Brown met

several times during the Spring of 2017, and Ms. Brown retained Plaintiff as her realtor to sell her home. Ex. 1 at 93:3-94:10, 94:21-95:10. Ex. 5. The listing price was to be $799,000 based on a market analysis prepared by Plaintiff and conversations between Plaintiff and Ms. Brown. Ex. 1 at 100:6-23. Plaintiff listed the property for sale, received inquiries regarding the sale and occasionally showed the property even though it was to be torn down. Ex. 1 at 101:22-104:3.

Plaintiff received offers for the purchase of the property. Ex. 1 at 105:7-20. Those offers were conveyed to Ms. Brown, who was not happy with the offers received. Ex. 1 at 106:19-107:4. The sale price was eventually lowered by about $100,000. Ex. 1 at 107:5-13.

On June 29, 2017 Plaintiff attempted to contact Ms. Brown by telephone. After being unable to reach Ms. Brown, Plaintiff contacted Ms. Brown's nephew who had referred Ms. Brown to Plaintiff. Ex. 1 at 109:3-13. The nephew provided Plaintiff with the number for Ms. Brown's adult daughter, Karen Ham. Ex. 1 at 107:3-8. The nephew told Plaintiff that Ms. Ham was "Crazy. Aggressive. Mean." and that he did not want it known that he had given Plaintiff Ms. Ham's phone number. Ex. 1 at 109:14-24.

Plaintiff first tried to reach Ms. Ham around noon on the 29th of June, 2017, did not get her on the phone, and did not leave her a message. Ex. 1 at 107:25-108:12. Plaintiff called Ms. Ham back  a second time and told her that Plaintiff was concerned that she couldn't find Ms. Brown. Ex. 1 at 107:25-108:12. Ms. Ham replied that she knows where Ms. Brown is and that she will call her back with her mom on the phone. Ex. 1 at 107:25-108:12. It was important for Plaintiff to speak to Ms. Brown because she is older, Plaintiff had not heard from her in a while, and people were calling who were interested in the property. Ex. 1 at 110:7-12.

Ms. Ham called Plaintiff back at 6:26pm on the 29th with Ms. Brown on the phone. Ex. 1 at 111:13-20. Ms. Ham "dominated and took over the conversation". Ex. 1 at 123:8-11. Plaintiff

8

began the conversation by asking Ms. Brown how she was doing, but Ms. Ham began asking about the listing, if offers had been received and what was going on with the sale.  Ex. 1 at 111:13-20. See also Ex 1 at 116:14-117:3.  Ms. Ham also demanded that the house be taken off of the market. Plaintiff replied to Ms. Ham that she was not authorized to discuss the listing or offers with her, and that she could not take the house off the market because Ms. Ham was not the homeowner and the homeowner had to make the request.  Ex 1 at 111:13-20.  See also Ex 1 at 119:16-19, 120:8-13.  During the call Plaintiff maintained a friendly tone of voice, while Ms. Ham was angry, screaming, mean and cursing.  Ex. 1 at 124:23-126:15.  Because of Ms. Ham's conduct, Plaintiff did not have a chance to inform Ms. Brown that there were people interested in purchasing the property or gaining access to it.  Ex. 1 at 114:24-116:10.

Prior to this conversation Plaintiff had been advised by Ms. Brown not to provide information to Ms. Ham.  Ex. 1 at 118:22-10.  During the phone call with Plaintiff, Ms. Ham and Ms. Brown, Ms. Brown said nothing substantial, including never granting Plaintiff permission to discuss the listing of the house with Ms. Ham, or instructing Plaintiff to take the house off the market, as Ms. Ham wanted.  Ex. 1 at 121:2-122:24.  Ms. Brown certainly could have done so had she wanted to.

At the end of the call, Plaintiff told Ms. Brown that she was here to help her and that Ms. Brown can call Plaintiff at any time.  Ex 1 at 111:13-20.  Ms. Brown stated that she will call Plaintiff back.  Ex. 1 at 114:5-10.  After the call Plaintiff tried to reach Ms. Brown several times. to no avail.  Ex. 1 at 128:6-129:2.

While Defendant claims that on June 29th, 2017 Comnas received a call complaining about Plaintiff's conduct from both Ms. Ham and Ms. Brown, and uses that alleged call to justify the termination of Plaintiff, See generally Comnas Dec. ¶¶10-14, Ex. 2 at 23:18-26:20, that is simply

not true.  The numerous factual errors and questions surrounding this alleged conversation raise substantial questions of fact as to whether it actually took place.

First, it is wholly unexplained why Ms. Brown and Ms. Ham allegedly spoke to Ms. Comnas to complain.  Ms. Comnas admits to never having spoken to them before that day, Comnas Dec. ¶10, raising a question as to why they would know to seek Ms. Comnas out to speak to her and complain.  Ex. 2 at 76:18-20.  Moreover, Ms. Comnas worked out of a different office than Plaintiff, Comnas Dec. ¶1 n.2, raising the question as to why they would call a different office of Defendant to complain about Plaintiff. Logically, if trying to reach a supervisor, you would call the office from which the agent was employed.

Second, the evidence does not support the alleged timing of the call between Ms. Comnas, Ms. Ham and Ms. Brown.  The timing of the call is after the office is closed.  Ex. 1 at 134: 20-135:2.  That Ms. Comnas was still in the office, or even answering the phones at that juncture, is unlikely.

Moreover, the documents do not support the timeline alleged by Defendant.  Defendant has averred that the Comnas call with Ms. Ham and Ms. Brown took place at approximately 7:00pm on June 29, 2017, immediately after the call between Ms. Ham, Ms. Brown and Plaintiff. Comnas Dec. ¶10.  See also Defendant's Statement of Uncontested Facts No. 26 and Ex. 1 at 111:13-20.  However, the email correspondence from Ms. Comnas to Mr. Nelson memorializing the conversation is at 4:10pm.  Ex. 4.  The transmittal of the email before the alleged conversation ever took place demonstrates that the complaint is a fabrication.  At minimum, questions of fact are raised regarding its veracity.

Third, further demonstrating that the alleged complaint was fabricated is the nature of the contact between Plaintiff and Ms. Brown following the alleged complaint.  After the alleged

complaint Ms. Brown continued to call Plaintiff, starting about a week after the call with Plaintiff and Ms. Ham and Plaintiff's subsequent termination.  Ex. 1 at 133:18-25.  Ex. 1 at 135:14-16.

Subsequently, on or about July 13, 2017, Plaintiff was called by the Southampton Police Department who stated that Ms. Brown had fallen and Ms. Brown had given Plaintiff as a person to contact to help her.  Ex. 1 at 138:17-140:21.  Because Plaintiff could not get to Ms. Brown quickly because of traffic, Plaintiff  asked her father to go help Ms. Brown.  Ex. 1 at 140:22-141:19.

When Plaintiff arrived, in addition to inquiring about Ms. Brown's health, Ex. 1 at 143:24-144:10, it was discussed that Plaintiff was no longer working for Defendant, but for Nest Seekers. Ex. 1 142:10-19.  At this time Ms. Brown expressed a desire to continue to be represented by Plaintiff and Plaintiff prepared an exclusive right to sell agreement for Ms. Brown with Nest Seekers that Ms. Brown signed.149:12-153:24; 157:7-24.  Ex. 6.  Ms. Brown also executed a termination letter with Defendant, indicating that it was because she wanted to Plaintiff to continue to represent her.  Ex. 7.  It is illogical that if Ms. Brown had complained about Plaintiff that she would have wanted Plaintiff to continue to represent her.  Indeed, Ms. Brown specifically denied making such a complaint about Plaintiff.  Ex. 1 at 136:6-21.

Fourth, Defendant's alleged actions during and after receiving the alleged complaint confirm that the complaint was fabricated.  The daughter of a client, a member of the general public, complained to Defendant about Plaintiff, with her mother on the phone.  Ex. 2 at 24:17-25:9.  It is claimed that Ms. Ham (and allegedly Ms. Brown, Defendant is unsure, Ex. 2 at 70:10-19), felt bullied, threatened and/or afraid of Plaintiff.  Ex. 2 at 70:3-9. However, other than Ms. Ham using the words "rude, bullying and threatening," there was no elaboration by the daughter on the conduct of Plaintiff that allegedly warranted termination.  Ex. 2 at 79:21-80:3.  There was

11

only one call with these people about this complaint, with the daughter, who was not the client, speaking more. Ex. 2 at 71:7-12.  If the complaint was so serious to justify termination, Defendant would certainly have sought more detail about the alleged misconduct, particularly insofar as it was coming from an individual who was not the client.

Notably, the email from Comnas to Nelson about the termination claims that Ms. Brown and Ms. Ham allegedly feared Plaintiff and in order to avoid retaliation they would have to wait a day or two until after the locks were changed to fire Plaintiff.  Ex.4.  Nevertheless, Plaintiff was fired the next day.

In addition, instead of investigating the merits of the complaint, or talking to Plaintiff about the complaint, defendant immediately sought to terminate Plaintiff's employment.  There was never any discussion about the complaint with Plaintiff, Ex. 2 at 71:15-19, giving the lie to any claim that Defendant desired to maintain Plaintiff's employment.  Defendant allegedly accepted the claims of a person who was not a client, and terminated Plaintiff on that basis.  Defendant could not recall terminating someone else under similar circumstances. Ex. 2 at 85:6-19.

Last, it should be noted that the email sent from Ms. Comnas to Jennifer Wisner, the agent who replaced Plaintiff in handling Ms. Brown's property, reflects that Plaintiff was correct in her actions in her call with Ms. Ham and Ms. Brown.  The email confirms ambivalence about who could be spoken to about listing as there was no Power of Attorney at the time entitling Ms. Ham to the knowledge.  Ex. 8.  Moreover, Ms. Comnas states that Ms. Wisner can "probably" speak to Ms. Ham about the listing, Ex. 8, indicating that it was unclear if she could do so and that Plaintiff was correct in declining to discuss the matter with Ms. Ham absent the express permission of Ms. Brown.

12

In light of the foregoing, Defendant's claim that they terminated Plaintiff because of an interaction between Plaintiff, Ms. Ham and Ms. Brown is doubtful at best, if not entirely fabricated.

## F.      Plaintiff is Terminated by Defendant

Prior to receiving an email to her personal email from Comnas terminating her employment, Plaintiff saw an email in her business account informing the staff that Plaintiff was no longer associated with Defendant.  Ex. 1 at 35:4-36:23.  An email was then sent to Plaintiff, terminating her.  Ex. 9.  After Plaintiff's termination from Defendant, she became affiliated with a brokerage known as Nest Seekers in July, 2017.  Ex. 1 at 7:7-15.

## ARGUMENT

## I.      Standard of Review

In the recent case of *Petterson v. State University of New York at Stony Brook*, 2019 WL 367840, at *4 (E.D.N.Y. Jan. 30, 2019) (DRH), this Court set forth the summary judgment standard to be applied in a discrimination action:

> Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. See *Viola v. Philips Med. SYS. of N. Am*., 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co*., 92 F.3d 81, 86 (2d Cir. 1996).

> To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc*., 7 F.3d 1067,

13

1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986) ) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful ... of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id*. at 211 (citing *Matsushita,* 475 U.S. at 587).

Applying this standard to the instant matter requires the denial of summary judgment.

II.     Plaintiff Has Properly Pled a Violation of 42 U.S.C. §1981

It is undisputed that Plaintiff and Defendant entered into a contract for Plaintiff to perform as a real estate sales person on behalf of the Defendant.  Ex A.  In discriminating against Plaintiff based on her race, and then ultimately terminating Plaintiff for that same reason, Defendant frustrated Plaintiff's ability to perform under the contract, and to enjoy all of the privileges of the contractual relationship.  Accordingly, Plaintiff has alleged a violation of 42 U.S.C. §1981.

42 U.S.C.A. § 1981(a), provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981(b) then goes on to define the term "make and enforce contracts" as the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  To state a claim under section

14

1981, a plaintiff must allege that "(1) he or she is a member of a protected class, (2) the defendant intentionally discriminated against him or her on the basis of membership in that protected class; and (3) the discrimination concerned one of [section] 1981's enumerated activities." *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)).

Plaintiff here has satisfied their burden.  Plaintiff is undisputedly a racial minority and a member of a protected class.  Plaintiff has also alleged that the discrimination against her was on the basis of her race and Defendant does not dispute this allegation.  The termination of Plaintiff under the contract directly concerns one of Section 1981's enumerated activities.  As such, Plaintiff has met her burden.

Defendant's sole argument for summary judgment on this claim is that many of the allegations of the Complaint are extra-contractual or non-contractual and are therefore immaterial to the §1981 claim. Def. Br. at 5-6.  Defendant essentially argues that Plaintiff has not satisfied the third prong of the standard with respect to certain allegations.  This argument is without merit.

As set forth above, Defendant continually failed to provide Plaintiff with support during her time under contract, refusing to meet with Plaintiff's clients or prospective clients and not answering Plaintiff's questions.  Defendant further did not list Plaintiff on the Up-Board, or give her credit for listings that she had updated.  These actions prevented Plaintiff from generating more income for both herself and Defendant, the purpose of the contract.  This pattern of discrimination then culminated in the termination of Plaintiff because she complained about Defendant's racist practices and because she was an African-American who was arrested.  Plaintiff's termination was the ultimate interference with Plaintiff's ability to perform under, and enjoy the benefits of, the contract.

Given this race-based interference with Plaintiff's performance under the contract, as well as the enjoyment of all benefits and privileges under the contract, Plaintiff has sufficiently alleged a violation of 42 U.S.C. §1981.  Importantly, even if Defendant's argument was correct, Plaintiff still has stated a claim for violating Section 1981 based on her termination.

In addition to Defendant's erroneous argument, Defendant misrepresents, and quotes out of context, the holding of the Supreme Court in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006).  Def. Br. at 5.  *Domino's Pizza* concerned the question of whether a non-party to a contract could bring an action for violations of 41 U.S.C. §1981.  *Id*.  In resolving this question, the Supreme Court wrote:

> Consistent with our prior case law, and as required by the plain text of the statute, we hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes "to make and enforce." Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's.

Id. at 479-80.  This situation has nothing to do with the situation in this case where Plaintiff, a party to the contract, was aggrieved by Defendant's actions. Defendant's out of context quotation from this case, as well as their reliance upon it, is wholly misplaced.

III.    Plaintiff Has raised Sufficient Questions of Fact to Warrant Denial of Summary Judgment

A.    The McDonnell-Douglas Framework Governs Plaintiff's Claims

Under Section 1981, a plaintiff may sue for discriminatory discharge. "The substantive standards for employment discrimination claims under §§ 1981 and 1983 mirror those for claims under Title VII." *Morales v. Rooney*, 509 Fed.Appx. 9, 10 (2d Cir. 2013).   See *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) ("[Plaintiff's] disparate treatment claims under Title VII, § 1981, and § 1983 are subject to the burden-shifting evidentiary framework set forth in McDonnell Douglas.").

16

In applying the McDonnell-Douglas standard, a plaintiff must first establish a prima facie case of discrimination by showing: "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp*., 196 F.3d 89, 95 (2d Cir. 1999). This prima facie case creates a presumption of discrimination, which is rebuttable if the defendant can articulate a legitimate, nondiscriminatory reason for the unfavorable employment decision. *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 767 (2d Cir. 2002). If the defendant can proffer this reason, to survive summary judgment the plaintiff must "point to evidence that reasonably supports a finding of prohibited discrimination." *Id*. (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142–43 (2000).

B.    Defendant Does Not Challenge Plaintiff's Prima Facie Case

Other than a single sentence stating that Plaintiff needs to meet her prima facie burden, Def. Br. at 7, Defendant offers no explanation as to why it thinks Plaintiff has not satisfied her burden to establish a prima facie case.  Given the absence of any contrary argument, this Court should find that Defendant has satisfied her prima facie burden.

A plaintiff's burden at the prima facie stage to offer evidence of circumstances giving rise to an inference of discrimination is "'minimal' and 'de minimis.'" *Zimmermann v. Assocs. First Capital Corp*., 251 F.3d 376, 381 (2d Cir. 2001) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 101 (2d Cir. 2001); *Abdu–Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 467 (2d Cir. 2001)). Indeed, this burden is so minimal that an increasing number of courts in this Circuit assume, without deciding, for purposes of a motion for summary judgment only, that plaintiffs have established a prima facie case. See, e.g., *Howard v. MTA Metro–North Commuter R.R*., 866 F.Supp.2d 196, 205 (S.D.N.Y. 2011) ("Despite the elaborate process set up in McDonnell Douglas,

17

Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.") (citing cases); *Morris v. Ales Grp. USA, Inc.*, 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007) ("Rather than apply the McDonnell Douglas test formalistically, the Court will assume that Morris has made out a prima facie case of discrimination on this claim."); *Hamilton v. Mount Sinai Hosp.*, 528 F.Supp.2d 431, 439–40 (S.D.N.Y. 2007); *Santos v. Costco Wholesale, Inc.*, 271 F.Supp.2d 565, 572 (S.D.N.Y. 2003); *Devlin v. Transp. Communications Intern. Union*, 2002 WL 413919, at *7 (S.D.N.Y. Mar. 14, 2002); *Lanahan v. Mut. Life Ins. Co. of New York*, 15 F.Supp.2d 381, 384 (S.D.N.Y. 1998); *Lapsley v. Columbia University–College of Physicians & Surgeons*, 999 F.Supp. 506, 514–15 (S.D.N.Y. 1998); see also *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (declining to reach question of whether plaintiff established a prima facie case because defendant met its burden of putting forth legitimate, nondiscriminatory reasons and plaintiff failed to proffer sufficient evidence of pretext). Given that Defendant has not articulated any arguments as to why the prima facie case has not been satisfied, this Court should simply assume that this de minimis threshold is met.

If the Court does choose to evaluate Plaintiff' prima facie case, Plaintiff has satisfied her burden. To establish a prima facie case of race discrimination, a plaintiff must prove that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (applying the same standard for race discrimination claims under Title VII); see also *Van Zant v. KLM Royal*

18

*Dutch Airlines*, 80 F.3d 708, 714–15 (2d Cir. 1996) (applying the Title VII analytical framework for discrimination claims to Sections 1981 and 1983 and the NYSHRL).

In this case, there can be no dispute as to any of the first three elements of the prima facie case.  Plaintiff is African-American and therefore a member of a protected class.  Plaintiff was an experienced realtor hired by Defendant, qualified for her position.  Plaintiff suffered an adverse employment action, her termination, as well as other repeated discriminatory act while on the job.

With respect to the fourth prong, Mr. Nelson's statements that Plaintiff is the only black agent in the Hamptons, Defendant's confirming that they never hired any other African-American real estate agents, the different treatment of Plaintiff from her white colleagues, the termination of Plaintiff after she made a complaint and was arrested (unlike other white agents who were also arrested), all lead to the finding that the termination of Plaintiff took place under circumstances giving rise to an inference of discrimination.

C.      The Reason Proffered by Defendant for Plaintiff's Termination is Pretext and Racial Discrimination is the Real Reason

In the Statement of Facts, Section E, *supra*, Plaintiff rebuts, at length, the stated reason for Plaintiff's termination, to wit: the alleged complaint of Ms. Ham and Ms. Brown about Plaintiff. It is both factually and logically impossible for a complaint to have been made in the manner Defendant claims and about Plaintiff.  In light of this fact, as well as the evidence of discriminatory animus by Defendant, Plaintiff has raised a sufficient question of fact as to the bona fides of Defendant's stated reason for terminating Plaintiff.  Thus, summary judgment must be denied.

There is a substantial need for caution in granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent. See *Holcomb v. Iona College*, 521, F.3d 130, 137 (2d Cir. 2008); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224

19

(2d Cir. 1994); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Direct evidence of discrimination, "a smoking gun," is typically unavailable. *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Courts need to be "alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir. 1989) (quotation marks omitted).

Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224. In many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive. *Reeves*, 530 U.S. at 147; see also id. at 154 (Ginsburg, J., concurring) ("[E]vidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation."). "It is well-settled that a plaintiff, in conjunction with other evidence, may demonstrate pretext in a discrimination case by pointing to 'weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-discriminatory reasons for its action.'" *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, 955 F.Supp.2d 118, 140 (E.D.N.Y. 2013) quoting *Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 291 (S.D.N.Y. 2001).

To avoid summary judgment in an employment discrimination case, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor

was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995); see also *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 78 (2d Cir. 2001).  A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the "impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (quotation marks omitted); see also *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("It is ... now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.").

In this case, there is substantial evidence that the real reason for Plaintiff's termination was racially motivated.  First, Plaintiff is not given the support from her superiors at work, not being helped to obtain clients in pitch meetings and even having Mr. Nelson intentionally walk out of one such meeting prematurely.  Plaintiff is not placed on the Up-Board as a means of generating leads, and she is not given answers to questions when asked.

Moreover, the very reason claimed by Defendant for Plaintiff's termination cannot be believed.  There is no logical reason why Ms. Brown and Ms. Ham would have contacted Ms. Comnas, as she neither worked in Plaintiff's office nor had contact with them previously.  It is also unlikely she was even in the office at the time of their call at 7pm.  Furthermore, an email allegedly written after the call demonstrates that the call took place at or before 4:10pm.  This contradiction indicates that Comnas was, at minimum, lying about the time of the call, but more likely lying about its very existence.

Even more relevant is the fact that one of the alleged complainants, Ms. Brown, the owner of the property, clearly and unambiguously wanted to continue on as Plaintiff's client.  Ms. Brown

signed a contract to that effect with Plaintiff's new brokerage firm and sent a termination letter to Defendant.  Ms. Brown even sought out Plaintiff's help after she had fallen.  It is illogical that Ms. Brown still would have sought out Plaintiff if she had complained about Plaintiff.

In addition to the pretextual nature of the dismissal and the discriminatory conduct at work in treating Plaintiff differently than her peers, the statements and actions of Defendant demonstrate clear bias against African-Americans.  Defendant did not hire any other African-American agents other than Plaintiff, who only lasted seven months.  Defendant referred to Plaintiff as the only black agent in the Hamptons.  Defendant said they had to change the locks when Plaintiff was fired, fearing that Plaintiff "could easily try to break in and do damage…"  Statements like this were not made when white agents left the firm.  All of these statements and actions demonstrate the bias of Defendant in dealing with Plaintiff, the sole African-American it employed.

Defendant's argument that this Court cannot second guess the "business judgment' of the Defendant in terminating Plaintiff, Def. Br at 10-11, is without merit.  Where a plaintiff disputes the basis of his termination as being manufactured against him in order to fire him, the court may find that the plaintiff has satisfied his burden of showing pretext.  *Turner v. National R.R. Passenger Corp.*, 181 F.Supp.2d 122, 133 (N.D.N.Y. 2002) citing *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170 (2d Cir. 1996) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)). In this case, as set forth above, Plaintiff has shown that the claimed reason for terminating Plaintiff was exaggerated, if not outright fabricated.  This fact, coupled with the other indicia of discriminatory animus, demonstrate sufficient evidence of pretext to survive summary judgment.

Notably, once again Defendant submits to the Court a partial quote to inaccurately support its arguments.  The quotation quoted by Defendant from *Randolph v. CIBC World Markets*, 2005

22

WL 704804 (S.D.N.Y. March 29, 2005), Def. Br. at 10, is correct, but Defendant fails to include

the pivotal lines that give the quote proper context and meaning.  After the quoted section, which

Defendant uses to claim that the Court cannot evaluate the employer's business judgment for a

termination, the court in *Randolph* goes on to say that: "Rather, the only relevant inquiry is whether

the plaintiff has come forward with enough evidence 'from which a rational fact finder could infer

unlawful discriminatory animus on the part of [the defendant].'" *Id*. at *12 quoting *Henry v.

Daytop Village, Inc.*, 42 F.3d 89, 96 (2d Cir. 1994).  In this case, by establishing the pretextual

basis for the termination of Plaintiff and the discriminatory acts of Defendant, Plaintiff has

submitted enough evidence from which a rational fact finder could infer discriminatory animus.

Plaintiff is not simply saying it is a bad decision to terminate her, she is saying the reason for the

termination given is false and that the real reason is discrimination.  A showing that similarly

situated employees belonging to a different racial group received more favorable treatment can

also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the

adverse job action was a pretext for racial discrimination.  *Graham v. Long Island R.R*., 230 F.3d

34, 43 (2d Cir. 2000).  If a jury were to conclude there was disparate treatment of the Plaintiff

compared to others, it could also reasonably conclude the reasons for terminating Plaintiff are

pretext.  *Id*.  Indeed, contrary to Defendant's claim, Def. Br. at 12-13, the facts set forth above

(Statement of Facts Section E), raises substantial questions as to whether a complaint was ever

lodged with Defendant that would justify Plaintiff's termination.

Defendant's further argument that "unfavorable workplace treatment and perceived

slights" do not constitute discrimination, Def. Br. at 11-12, is an improper attempt at minimizing

the conduct to which Plaintiff was subjected.  Employment actions that the Second Circuit has

deemed sufficiently disadvantageous to constitute an "adverse employment action" include "'a

termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.'" *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Williams v. R.H. Donnelley, Corp*., 368 F.3d 123, 128 (2d Cir. 2004) (internal quotation marks omitted)). "[T]here is no exhaustive list of what constitutes an adverse employment action. Courts have held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." *Little v. NBC*, 210 F.Supp.2d 330, 384 (S.D.N.Y. 2002).

Plaintiff was prevented from earning money by Defendant.  She was denied the support other Caucasian agents received, such as the presence of management at sales pitch meetings, support and advice.  This inhibited Plaintiff from obtaining and marketing listings which, in turn, prevented Plaintiff from earning money.  Plaintiff was also denied the opportunity to make money by not being listed on the Up-Board and not being given credit for listings that she updated. Depriving Plaintiff of the means to earn increased monies is a clear "adverse employment action."

Last, Defendant grossly misconstrues Plaintiff's argument of discrimination when it argues that Plaintiff is speculating by attributing all of the things that happened to her to her race solely because she was Defendant's sole African-American employee. Def. Br. at 11-12. That is not the case.  Plaintiff was repeatedly treated differently than her peers in matters that were common to the functioning of the business.  She was deprived of support, deprived of business development opportunities, and then fired a week after an arrest of hers became known.  This is in stark contrast

to the experience of white agents, who were given support and business development opportunities, and were not fired after being arrested.  Disparate treatment, when the only difference is race, is common in discrimination.  See e.g. *Graham*, 230 F. 3d 34.

In light of the foregoing, Plaintiff has demonstrated that substantial question of facts exist regarding the reason for Plaintiff's termination.  As such, summary judgment must be denied.

## IV.     Plaintiff Has Sufficient Evidence to Sustain Her Burden of Proof at Trial

Without pointing to any specific gaps in proof or evidence that is lacking, Defendant makes the blunderbuss argument that Plaintiff does not have sufficient evidence n admissible form that would allow for a verdict in Plaintiff's favor.  Def. Br. at 13-14.  However, as set forth above, Plaintiff has adduced ample evidence from which a jury could conclude that Plaintiff was discriminated against based on her race during her tenure of employment and in her termination. Accordingly, summary judgment is unwarranted and this matter should proceed to trial.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment must be denied in all respects.

Dated: New York, New York
         August 30, 2019

                                         Law Offices of G. Oliver Koppell & Associates

                                         By:_____/s/_____
                                         G. Oliver Koppell (GOK-4851)
                                         Daniel F. Schreck (DS-7680)
                                         *Attorneys for Plaintiff*
                                         99 Park Ave., Suite 1100
                                         New York, New York 10016
                                         (212) 867-3838