UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SHAUNCY CLAUD

                   Plaintiff,

-against-

BROWN HARRIS STEVENS RESIDENTIAL
SALES, LLC,[1] and BROWN HARRIS STEVENS
OF THE HAMPTONS, LLC,

                Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
18-CV-1390 (DRH)(AKT)

**APPEARANCES:**

**For Plaintiff:**
Law Offices of G. Oliver Koppell & Associates
99 Park Avenue, Suite 1100
New York, New York 10016
By:   G. Oliver Koppell, Esq.
       Daniel F. Schreck, Esq.

**For Defendant Brown Harris Stevens of the Hamptons, LLC:**
Law Offices of Andrew P. Saulitis, P.C.
40 Wall Street – 37th Floor
New York, New York 10005
By:   Andrew P. Saulitis, Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Shauncy Claud ("Claud" or "Plaintiff") commenced this action

against defendant Brown Harris Stevens of the Hamptons, LLC ("BHSH" or

"Defendant") asserting a claim pursuant to 42 U.S.C. § 1981. Presently before the

---

[1] By stipulation of dismissal So Ordered on August 6, 2018, the claims against Brown Harris Stevens Residential Sales, LLC were dismissed.

Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### I.  Undisputed Facts

The following facts are undisputed unless otherwise noted.

From November 7, 2016 through June 30, 2017, Claud was associated, as an independent contractor, with BHSH as a licensed real estate salesperson under the terms of two substantially similar Independent Agent Agreements dated November 7, 2016 and April 10, 2017 (the "IA Agreement"). (Pl.'s Counter 56.1 at ¶ 1.)

Among other things, the IA Agreement provides that "[Claud] is engaged as an independent agent associated with Broker [BHSH] and shall not be treated as an employee for federal and New York state tax purposes . . . or for any other purposes." It further provides that Claud "shall be permitted to work any hours he or she chooses" and "shall be permitted to work out of his or her own home or the office of the Broker." The "[IA] Agreement and the association created thereby may be terminated by either party thereto at any time for any or no reason upon written notice given to each other." Claud's compensation was "on a commission on [her] gross sales, if any," which "commissions shall be computed in accordance with [BHSH's] standard policies and procedures as modified from time to time in [BHSH's] sole discretion." The IA Agreement does not accord Claud any draw, any minimum commissions, or any other benefits. The IA Agreement is substantially the same as the agreements for all other licensed real estate salespersons at BHSH,

as were the commission arrangements.  From the beginning of her association with BHSH through June 2017, Claud earned a total of $8,067 in commissions, which she received in full. (Pl.'s Counter 56.1 at ¶¶ 2-9.)

On April 17, 2017, BHSH entered into an Exclusive Right to Sell the residential real property located at 300 Moses Lane, Southampton, New York 11968 (the "300 Moses Property') with Cassandra Ham-Brown ("Brown"), the owner of said property.  Under the terms of the agreement with Brown, BHSH was the exclusive agent for a one-year period, from April 17, 2017 through April 16, 2018 and the property would be represented by Claud. It further provided that BHSH "will . . . present all offers [to Brown]" and "will maintain and provide to [Brown] at [her] request, a list of all customers to whom the Property has been shown or who have expressed an interest in it." (Pl.'s Counter 56.1 at ¶¶ 10-13.)

On June 29, 2017, unable to reach Brown, Claud called Karen L. Ham ("Ham"), Brown's adult daughter. Claud spoke to Ham twice. In those telephone calls Claud told Ham that she wanted to speak to Brown about the 300 Moses Property, that there had been "people . . . calling who were interested" in it and wanted to see it. Claud said she "had received [two or three] offers on the property" including specific amounts and she "had that information at [her] disposal."  Ham told Claud she knew where Brown was, that she was aware of who Claud was and that she would call Claud right back with Brown on the line; Claud responded that would be "okay."  (Pl.'s Counter 56.1 at ¶¶ 14-17.)

Shortly thereafter on June 29, 2017 at 6:26 p.m. Claud had a telephone conference with Brown and Ham in connection with the 300 Moses Property listing. Brown did not object during the call to her daughter being a participant. However, according to Claud she had previously been instructed not to discuss offers for the property with Ham. During the course of the call, Claud informed Ham that she couldn't discuss the sale of the house with her. Ham demanded Claud take the house off the market, which Claud refused to do as Ham was not the client. The call was an unpleasant one although Claud states her tone remained friendly while Ham screamed and cursed during the call.  The conversation ended with Claud hanging up on Brown and Ham. Claud did not report the conversation to BHSH. (Pl.'s Counter 56.1 at ¶¶ 18-25.)

According to BHSH, that same day at about 7:00 p.m. Ham, with Brown on the line called Aspasia Comnas ("Comnas"), Executive Managing director of BHSH. According to Comnas, Ham reported the phone conversation with Claud, complained of Claud's conduct toward her and her mother, and asked that Claud no longer act as the representative for the 300 Moses Property. The next day Claud's IA Agreement was terminated by Comnas. As discussed below, Plaintiff disputes that the call with Comnas ever took place. (Pl.'s Counter 56.1 at ¶¶ 26-27.)

After Claud was terminated, a new agent was appointed to replace her on Brown's listing, which change was memorialized in an amended exclusive listing agreement. BHSH continued the exclusive listing for the 300 Moses Property, albeit

at a lower asking price. The property did not sell and the listing eventually expired. (Pl.'s Counter 56.1 at ¶ 35.)

Almost immediately after her termination, Plaintiff became associated with Nest Seekers LLS, located at 20 Main Street, Southampton, NEW York as a licensed real estate salesperson. During her first seven months with Nest Seekers, Plaintiff earned $10,851 in commissions, which was somewhat more than she earned during her seven months at BHSH. (Pl.'s Counter 56.1 at ¶¶ 38-39.)

## II.   Additional Facts Proffered by Plaintiff[2]

Plaintiff is African-American and a licensed real estate person. Her first experience in real estate was as a salesperson for Town & Country real estate, where she worked from November 2014 through November 2016.  Upon leaving that entity she began working for Defendant. (Pl.'s Counter 56.1 at ¶¶ 47-50.)

While at BHSH Plaintiff's immediate supervisor was Robert Nelson ("Nelson"), Senior Managing Director. Comnas, the Executive Managing Director of BHSH, worked out of the Bridgehampton and East Hampton offices. She was a more senior person who Plaintiff did not see regularly but consulted with on questions or issues. (Pl.'s Counter 56.1 at ¶¶ 53-54.)

According to Plaintiff, Nelson said to her "in a not nice tone of voice that she was the only black agent in the Hamptons" and never gave her any support by accompanying her to sales pitch meeting like managers are supposed to and so she

---

[2] The Court's recitation contains only matters supported by admissible evidence, i.e.-hearsay statements, such as Plaintiff's deposition testimony that Brown told Plaintiff she did not complain about her, are not included.

had to ask other senior agents to accompany her. At her deposition she testified

that Nelson accompanied white sales agents to sales pitch meetings but could not

identify any particular agent that he accompanied. Other occasions on which Nelson

did not assist her include: (1) refusing to meet with Plaintiff when she first brought

to Defendant the exclusive listing on a substantial property; (2) declining to

accompany her to a client meeting so that the client could met a member of BHSH's

management team and a price reduction could be discussed and telling her to just

send a letter; (3) in response to a request for assistance in preparing "comps" for a

particular property, telling her to "Google" or "YouTube" her question; (4) excluding

her from the "Up-Board, a form of lead generation for persons who either call or

walk into the office and are interesting in buying selling or renting real estate; and

(5) refusing to give Plaintiff credit for work she had done in updating listing to the

current pricing and availability. (Pl.'s Counter 56.1 at ¶¶ 61-70.)

On June 14, 2017, Plaintiff met with Comnas at the Southampton office; the

meeting was at Plaintiff's request.  Plaintiff told Comnas that Nelson "made [her]

uncomfortable with [her] race, and [she] wasn't getting the support that [she] saw

him giving [her] colleagues." She told Comnas "he treats me differently than he

treats non-African American real estate salespersons." Plaintiff told Comnas about

a time when right in the middle of an appointment with a homeowner, Nelson just

got up, how she was embarrassed and did not get the listing; that she needed

support, the support Nelson gave her colleagues. Plaintiff asked Comnas not to tell

Nelson as she was afraid of how he would respond.  Plaintiff was fired shortly

thereafter.  Defendant denies the claimed June 14 meeting ever took place. (Pl.'s Counter 56.1 at ¶¶ 71-74.)

On June 17 or 18, Plaintiff was arrested for knocking over a tip jar at a restaurant. As a result of the arrest, Plaintiff pled guilty to a violation. The Southampton Press ran an article about her arrest on June 23, 2017, a week prior to her termination. Copies of the newspaper were available at the offices of Defendant. After being made aware of the upcoming article, Plaintiff sent the following email to Nelson: "There was an alleged incident that you may be made aware of involving myself at Gators. I've been advised by counsel to not speak about the matter. I've never been in a situation like this and I'm taken back by the allegations being made against me. What's being said is entirely untrue and I'll be working with counsel to have the situation dropped immediately." Comnas admits she and Nelson discussed the email, although she denied they knew what the email was talking about and said they conducted no follow-up regarding it. Comnas also claims to be unaware of the arrest of two other Caucasian agents during their employment, who were not fired by Defendant.  (Pl.'s Counter 56.1 at ¶¶ 76-83.)

Plaintiff became aware of Brown as a potential client through Brown's nephew, who was good friends with Plaintiff and her family. After several meeting Plaintiff was retained by her as her realtor to sell her home. The listing price was to be $799,000.00. Plaintiff received inquiries regarding the property and occasionally showed the property. She received offers to purchase which she conveyed to Brown,

who was not happy with the offers received. The sale price was eventually lowered by $100,000.00. (Pl.'s Counter 56.1 at ¶¶ 84-92.)

Starting about a week after she was terminated by BHSH, Brown continued to call Plaintiff. On or about July 13, 2017, Plaintiff was called by the Southampton Police department and told her Brown has fallen and had given Plaintiff as a person to contact to help her. When Plaintiff saw Brown, they discussed that Plaintiff was no longer working for Defendant and Brown expressed a desire to continue to be represented by Plaintiff. Plaintiff prepared an exclusive right to sell agreement for Brown with Nest Seekers and a terminate letter for BHSH, both of which Brown signed. (Pl.'s Counter 56.1 at ¶¶ 108-110.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234,

236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole

could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))

(internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits,

depositions, or other documentation, the non-movant must offer similar materials

setting forth specific facts demonstrating that there is a genuine dispute of material

fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant

must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193,

205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt

as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)

(quoting *Matsushita*, 475 U.S. at 586-87), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Id.* (quoting *FDIC v. Great Am. Ins.

Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

The district court considering a summary judgment motion must also be

"mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS

Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252),

because the "evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination[s] of summary judgment motions," *Brady v.

Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant]

will bear the burden of proof on an issue at trial, the moving party may satisfy its

burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11) (internal quotation marks omitted).  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).  "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Section 1981

Section 1981 safeguards an individual's right to "make and enforce contracts" from racial discrimination. 42 U.S.C. § 1981.  To fall within its scope of protection, a plaintiff must show that the defendant impeded one of his/her contractual rights, which include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C § 1981(b); *see Clark v. City of New York*, 2014 WL 4804237, at *2 (E.D.N.Y. Sept. 25, 2014). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

It is settled in the Second Circuit that at-will employment is a "contractual relationship within the meaning of § 1981." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). Under Section 1981, a plaintiff may sue for discriminatory discharge. *Id*. at 264.

"To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiff[] [is a] member[] of a racial minority; (2) defendant['s] intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta, N. Y.*, 221 F.3d 329, 339 (2d Cir. 2000) (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam)); *accord Ludwig's Drugstore, Inc. v. Forest City Enterprises, Inc.*, 2016 WL 915102, at *12 (E.D.N.Y. Mar. 4, 2016) (quoting *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (citation omitted)). Liability under § 1981 requires "proof of intentional discrimination." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982). Although the statute is silent on the issue, "42 U.S.C. § 1981 encompasses claims of retaliation." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

Claims under Section 1981, whether for straight discrimination or retaliation, are analyzed using the *McDonnell Douglas* burden-shifting framework. *Id.; Littlejohn v. City of New York*, 795 F.3d 297, 315  (2d Cir. 2015 ("Retaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework" (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010))); *Fincher v. Depository Trust & Clearing*

*Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (same); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 209-10 (E.D.N.Y. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Acosta v. City of New York*, 2012 WL 1506954 at *8 (S.D.N.Y. Apr. 26, 2012). Under that framework, the plaintiff must first establish a prima facie case of discrimination. *Id*. To establish a prima facie case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he has suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Id*. If the plaintiff meets this "minimal" burden, *Holcomb v. Iona Coll.,* 521 F.3d 130, 139 (2d Cir. 2008), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the challenged conduct, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn,* 795 F.3d at 307, 311). If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff to show that the defendant-employer's reason was pretext for the discrimination. *Id*. at 83.

The requirement of producing evidence to support an inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.' " *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [a] [p]laintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013)

(citations omitted); *see also Chertkova,* 92 F.3d at 91 ("[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination."). An inference of discrimination can be drawn from circumstances, including, without limitation, by showing that the defendant treated  the plaintiff "less favorably than a similarly situated [person] outside his[/her] protected group," *Toussaint v. NY Dialysis Servs.*, Inc., 706 F. App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000)); *Saji,* 724 F. App'x at 17 (stating an inference of discrimination may be established by evidence of "more favorable treatment of employees not in the protected group") (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). "In assessing the record to determine whether there is a genuine issue to be tried," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir. 1999)).

When seeking to establish an inference of discrimination through evidence of more favorable treatment of persons not in the protected group, "the plaintiff must show that the comparators in question were similarly situated to the plaintiff in all material respects."  *Saji*, 724 F. App'x at 17 (citations and internal quotation marks omitted). "Although the question of whether two individuals were 'similarly situated' for these purposes is often a question for the jury, 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the

similarly situated prong met.' " *Id.* (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

## III.   Application to the Present Case

Plaintiff has satisfied the first prong required in a ¶ 1981 case as it is undisputed that she is African-American.

Plaintiff has also satisfied the third prong. Section 1981 defines the scope of protected contract rights to include: "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The IA Agreement constituted a contractual relationship between Plaintiff and Defendant and the alleged discrimination terminated Plaintiff's ability to enjoy the benefits of that contract, including the ability to earn commissions. *Cf. Rojas v. Signature Bank*, 2019 WL 1333257, at *2 (E.D.N.Y., 2019) ("Plaintiff and Defendant had a contractual relationship, as account holder and bank respectively, and Defendant's alleged discrimination concerned Plaintiff's ability to make and enforce that contract, one of the activities enumerated in § 1981.")  That the contract was terminable by either party for "any reason" does not change that conclusion. Just as an employment at will can be terminated for any reason or no reason, but not for a discriminatory reason, *see* cases cited *supra*, the IA Agreement could not be terminated for a discriminatory reason.

It is the second prong of a §1981 claim that is the appropriate focus for present purposes.

Plaintiff advances two theories in support of her claim that the IA Agreement was terminated for a discriminatory reason. First, she contends that she was fired due to her arrest whereas white agents who were arrested were not fired. Second, she claims that she was fired as a result of her complaint to Comnas about Nelson's discriminatory treatment of her. It is to these topics the Court now turns.

## A.    Plaintiff's Arrest

Plaintiff has failed to submit sufficient evidence to permit a jury to conclude that her IA Agreement was terminated because of her arrest while the agreements of non-African-American agents who were arrested were not terminated.

First, Plaintiff has not demonstrated that either Nelson or Comnas knew of her arrest. Her reliance on the email she sent is misplaced. While she characterizes it as advising them of her arrest, in fact it does not. It refers to a legal matter but does not characterize its nature, viz. civil or criminal. or otherwise provide any particulars thereof. And while a copy of the publication which reported on the arrest was, according to Plaintiff, available in the Defendant's office, there is no testimony concerning whether Comnas or Nelson saw the article and Comnas's testimony that she was unaware of the arrest is unrebutted.

Furthermore, evidence to support the claim of disparate treatment, viz. that non-African-American agents were arrested but not terminated, is lacking.  While in her deposition Plaintiff identifies two Caucasian agents who were arrested but not fired, she fails to provide any details to support that she was "similarly situated" to either of them "in all material respects," *Ruiz v. Cty. of Rockland*, 609

F.3d 486, 493 (2d Cir. 2010). By way of example, there is no information as to how long these other individuals had been associated with Defendant or the nature of the charges against them. Indeed, the record before this Court does not contain the charges that Plaintiff faced; Plaintiff only states she pled guilty to "a violation." The failure to provide evidence that she was similarly situated to these individuals is fatal to Plaintiff's disparate treatment claim premised upon her arrest. *See Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (concluding that the plaintiff had not shown disparate treatment where she "did not submit any evidence pertaining to her comparators' job duties, assignments, bonuses, or salary increases"); *Pierre v. Air Serv Security*, 2016 WL 11396816, at *6 (E.D.N.Y. July 28, 2016) (finding that the plaintiff failed to establish a prima facie case of discrimination where he "fail[ed] to offer any evidence to support the proposition that he is either similarly situated to other employees or that he was treated any differently"), adopted by decision reported at 2016 WL 5136256 (E.D.N.Y. Sept. 21, 2016).

Plaintiff points to the fact that Comnas felt it was necessary to change the locks because of Plaintiff's termination and claims that the locks at the office were not changed when other agents who were not African Americans "left" Defendant's employ. She fails to identify the agents who "left" and submits no evidence as to the circumstance of their departure such as whether such as whether they were terminated, as opposed to having left voluntarily. Her failure to demonstrate that

she was similarly situated to the unidentified agents who left precludes an inference of discrimination based on the changing of the locks to Defendant's office.

Summary judgment is granted to the extent Plaintiff's 1981 claim is premised on her arrest.

### B.   Plaintiff's Complaint to Comnas Concerning Nelson

Plaintiff's second theory of discrimination is that she was fired because of her complaint to Comnas about Nelson. As such, the claim falls within the rubric of a retaliation claim.

As stated earlier, retaliation claims under ¶ 1981 are analyzed under the *McDonnel-Douglas* framework whereby a plaintiff must first establish "a prima facie case of retaliation." *Russell v. N.Y.U.,* 739 F. App'x 28, 32 (2d Cir. 2018) (quoting *Hick*s, 593 F.3d at 164). This requires a plaintiff to show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Russell, 739 F. App'x at 32 (quoting Hicks, 593 F.3d at 164).

If the plaintiff sustains this initial "de miminis" burden*, Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018), a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji*, 724 F. App'x at 14 (quoting Hicks, 593 F.3d at 164). "If the defendant does so, then the burden shifts back to the plaintiff . . . [to] show that the reason offered by the employer is merely pretext, and that the

employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.' " *Id.* (quoting *Ya–Chen Chen v. City Univ. of N.Y.,* 805 F.3d 59, 70 (2d Cir. 2015)). " But-for causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan,* 888 F.3d at 625 (internal quotation marks omitted); *Johnson v. Schmid,* 750 F. App'x 12, 18 (2d Cir. 2018) (applying but-for causation principles to the plaintiff's section 1981 claim).

Plaintiff has submitted sufficient evidence to support her prima facie burden for the claim of retaliation. Turning first to engaging in protected activity of which the employer is aware, those elements are satisfied by, among other things, "informal protests of discriminatory employment practices, including making complaints to management." *DeVore v. Neighborhood Housing Servs. of Jamaica, Inc.,* 2017 WL 1034787, *9 (E.D.N.Y. Mar. 16, 2017) (citing *Littlejohn,* 795 F.3d at 317-18 ). Here, the protected activity consists of Claud's complaint to Comnas concerning Nelson, to wit that he made her uncomfortable because of her race and treated her differently than non-African-American salespersons. *Cf. Mayers v. Emigrant Bancorp, Inc.,* 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) ("An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law.") The deposition testimony of plaintiff concerning this conversation is sufficient to permit a jury to conclude that she was complaining about race discrimination, as opposed to unfair treatment untethered

to her protected status. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011). While Defendant contends that this conversation never took place, that factual dispute cannot be resolved in the context of a motion for summary judgment.

Plaintiff has also presented sufficient evidence in support of the third and fourth elements of her prima facie case. The adverse action is the termination of her IA Agreement. Given that the termination occurred less than one month after Plaintiff's reported conversation with Comnas, there is sufficient evidence of causation. *See Williams v. County of Nassau*, 2019 WL 2270518, at * 11 (E.D.N.Y. May 28, 2019) (stating that one of the ways to support the element of causation is "by showing that the protected activity was followed closely by discriminatory treatment," and that while the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," it has "upheld an inference of a causal connection based on lapses of up to eight months between the protected activity and the alleged retaliatory actions.") (citing cases), *aff'd,* 806 F. App'x 75 (2d Cir. 2020).

In response, Defendant offers as its "legitimate, non-retaliatory reason" for the termination of the IA Agreement, the telephone call from Brown and Ham complaining about Claud. The burden therefore shifts to Plaintiff to show pretext.

Here, Plaintiff disputes that the telephone call from Ham and Brown ever took place. She points out that (1) Comnas works out of a different office than her, raising questions as to why Ham and Brown would call a different office to complain

about her when Comnas admits she had never before spoken to either of them; (2) the timing of the call is after the office is closed, calling into question whether Comnas was still in the office or answering phones at that juncture; (3) the extended nature of the contact between Claud and Brown following the alleged complaint, including her continued representation of Brown; and (4) BHSH's failure to investigate the complaint or discuss it with Plaintiff. (Pl.'s Counter 56.1 at ¶¶ 26.)[3] If nothing else, the testimony regarding the continuing contact between Plaintiff and Brown following the complaint and Brown's notification to BHSH that she wished to terminate the contract with Defendant because she agreed to work exclusively with Plaintiff and did not want to work with any other BHSH agent (Ex. 7 to Koppell Declar.) sufficiently raise the issue of pretext. Thus the question of whether the termination of Plaintiff's IA Agreement was in retaliation for protected activity must be decided by a jury.

## CONCLUSION

Defendant's motion for summary judgment is granted to the extent that Plaintiff's 1981 claim is premised on her arrest but denied to the extent that it is premised on retaliation.

**SO ORDERED.**

Dated: Central Islip, New York       s/ Denis R. Hurley
       July 7, 2020                Denis R. Hurley
                                     United States District Judge

---

[3] Plaintiff also argues that the email exchange between Comnas and Nelson regarding Comnas' telephone call with Ham and Brown supports pretext because one of the emails has a time of 4:10 p.m., before the alleged conversation with Ham and Brown took place. Defendant, however, has submitted unrebutted evidence that Nelson was on the west coast that day and the differing time zone explains the 4:10 time.