UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Shauncy Claud,** | No. 2:18-CV-01390-NRM-ST |
| Plaintiff, | **Findings of Fact and Conclusions of Law** |
| v. | |
| **Brown Harris Stevens of The Hamptons, LLC,** | |
| Defendant. | |

**NINA R. MORRISON**, United States District Judge:

On June 30, 2017, Plaintiff Shauncy Claud's emerging career in the Hamptons real estate industry came to a sudden and unexpected halt.  Just eight months earlier, she had become the only Black agent associated with Brown Harris Stevens of the Hamptons ("BHSH"), a prominent real estate firm with six offices in the region.  Born and raised in Southampton, Claud had the ambition, interpersonal skills, and local contacts that were well suited to her chosen career.  But after a single phone call in which a previously unknown third party allegedly complained to BHSH's senior executive about Claud's "rudeness," Claud was summarily terminated.  She was not asked by anyone at BHSH to provide her version of what may have transpired with the disgruntled caller, nor was she given a reason for her sudden firing.  Instead, despite an otherwise-unblemished record over the preceding eight months, she was told only in a curt email that the firm was "not the right fit" for her.

In March 2018, Claud sued BHSH under 42 U.S.C. § 1981.  She asserted, *inter alia,* that she was treated differently because of her race than were similarly situated White agents at the firm, and that her termination was an act of retaliation for a complaint she had made to BHSH's senior executive manager in the region about an apparent pattern of race

discrimination by her direct supervisor, which Claud had presented in a private meeting with a senior executive just two weeks before she was fired.

After discovery, BHSH moved for summary judgment, and Judge Dennis R. Hurley granted the motion in part and denied it in part, finding that there existed a genuine disputed issue of material fact on Claud's retaliatory termination claim. *See* Summ. J. Op., ECF No. 34. This case was reassigned to me in October 2022. I presided over a bench trial between February 8–10, 2023, and now issue these Findings of Fact and Conclusions of Law.

As set forth below, I find that Claud has readily met her burden of proving that BHSH's termination was retaliatory, in direct violation of 42 U.S.C. § 1981. To be clear, under the terms of her Independent Agent Agreement ("Agreement") with BHSH, Claud was an independent contractor who could be fired at will for any non-discriminatory reason, even an arbitrary one. Nonetheless, federal law protects a plaintiff who engages in a protected activity—here, complaining of racial discrimination by a supervisor—and is retaliated against as a result. The only issue here is whether Claud was terminated for the reason proffered by BHSH, or whether it was a pretext for retaliation in the wake of her discrimination complaint.

For the following reasons, I find that BHSH's proffered reason for Claud's termination was wholly pretextual. I further find that, due to BHSH's violation of her right to contract and the substantial harms caused, Claud is entitled to an award of both compensatory and punitive damages.

## I.   FINDINGS OF FACT

Plaintiff Shauncy Claud grew up in the same town where her parents grew up, where her grandparents live, and where she would eventually become a real estate agent: Southampton, New York. *See* Tr. 46:9–11; Tr. 49:8–10. Claud attended Southampton High School and then worked as a local tennis pro and summer coach. Tr. 46:10–18. Following that work, Claud trained at IMG Sports Academy in Florida for "six, seven hours a day in order to obtain a college scholarship" in basketball. Tr. 46:18–47:4. Claud then went to Notre Dame Prep School and, in 2010, earned her associate's degree at Suffolk County Community College. Tr. 47:6–10.

Claud then began coursework towards sociology and criminology degrees at Barry University in Miami, Florida, but moved home to Southampton to be closer to her family after her grandmother became ill. Tr. 47:16–24. Once home, Claud decided to pursue a career in real estate. Tr. 47:25. Claud's choice was based in part on her view of the Hamptons as one of the most "expensive and exquisite areas in the world," with a lucrative market for both home sales and high-dollar rentals. Tr. 48:2–5. She viewed it as career in which she "could do very, very well" financially while remaining close to home. *See* Tr. 47:24; Tr. 48:5.

## A.     Claud's employment at BHSH

Following a two-week course and state exam, Claud obtained her license. Tr. 47:25; 48:13-17. With her new license, Claud became a real estate salesperson at the firm Town & Country in 2014. Tr. 49:12–13. Working out of the brokerage's Southampton office, Claud met with prospective clients looking to sell their homes or rent homes to summer vacationers, explained market analyses so that clients could price their homes, and actively marketed the homes for which she ultimately obtained listings, including by meeting with potential buyers and renters. Tr. 50:5–19.

Claud worked full-time during the week and often on weekends; she eventually built a portfolio that included approximately 400 to 500 listings. Tr. 51:24–25; 54:5–13. But Town & Country's policies gave agents no commissions on rentals and only a 10 percent commission on "open" listings, which allow any agent or brokerage to contact a homeowner directly. Tr. 52:19–25; Tr. 53:18–24. And Claud had only one "exclusive" listing, in which a homeowner works exclusively with a specific real estate agent. Tr. 52:4–6; Tr. 56.4. As a result, Claud netted less than $40,000 over two years while at Town and Country. Tr. 55:4–11.

One day, Claud showed a young couple a condo listed by a BHSH agent. Tr. 57:1–11, 14–22. The BHSH agent representing the seller asked Claud why she was working at Town & Country, told Claud she "would be a superstar at Brown Harris Stevens," and predicted that Claud "would do very well" if she switched firms. Tr. 57:4–7. Claud decided to remain with Town & Country for the time being. But about a year later, Claud recontacted the BHSH agent to explore the possibility of making a move to BHSH. Tr. 57:15–

17.  Claud had come to believe she could and should be earning
"substantial[ly] more income," and had lunch with the agent to discuss a
potential role at BHSH.  *See* Tr. 57:16–20.  The BHSH agent was
enthusiastic about Claud joining BHSH and connected Claud with BHSH
Senior Executive Director Robert Nelson.  Tr. 57:14–22; 58:1.

Nelson had started at BHSH as an agent in approximately 2013.  *See*
Tr. 463:4–5.  By 2015, he became Senior Managing Director, a managerial
role in which he supervised the work of agents in BHSH's Southampton,
Westhampton, and Sag Harbor offices.  *See* Tr. 463:5–13, 21–23.  Nelson
obtained his 2015 promotion to Senior Managing Director based on the
recommendation of Aspasia "Cia" Comnas.  Tr. 480:19–481:3.

Comnas served as the Executive Managing Director of BHSH from
2010 until 2019.  Tr. 234:8–11.  In this role, Comnas was responsible for
managing BHSH's six offices.  Tr. 235:3–5, 9–18; *see also* Tr. 463:22–464:1
(listing offices).  She oversaw marketing, assisted agents with listings,
managed budgets, and had ultimate responsibility for hiring and firing
employees and independent agents.  *See* Tr. 235:3–8.  Comnas was based in
BHSH's Bridgehampton office but oversaw the operation of all of BHSH's
offices.  Tr. 235:3–5; Tr. 241:9.

Nelson and Claud met in the fall of 2016.[1]  *See* Tr. 57:20–58:1.  Nelson
testified at trial that he found Claud to be "smart" and "well presented," and
thought she would make a "terrific agent."  *See* Tr. 464:23–24; Tr. 465:9–10.
He offered her the opportunity to join BHSH as a full-time independent real
estate agent, which she accepted.  *See* Tr. 58:15–59:3; Tr. 465:13–15.

### 1.    Claud's early tenure at BHSH

Claud signed an Independent Agent Agreement ("Agreement") and

---

[1] Neither Nelson nor Claud gave an approximate date of this meeting,
but Claud recalled meeting with Nelson about a week after her lunch with
Gail, the BHSH agent who recruited her to join the firm, and that her
November 2016 start date was "shortly after" her meeting with Nelson.  *See*
Tr. 57:20–58:1, Tr. 59:2–3; *see also* Tr. 464:16–17.

began working at BHSH in early November 2016. Tr. 59:1–3; Joint Pre-Trial Order, ECF No. 58 (Dec. 16, 2022), at 7; Pl's Ex. 14. She was based in BHSH's Southampton office, which Nelson oversaw. Tr. 463:21.

The Agreement stated she would be an independent contractor, not an employee; earn only commissions as compensation; and receive "professional assistance" from BHSH in the pursuit of her agent duties. Pl.'s Ex. 14; *see also* ECF No. 58, at 7–8 (stating stipulated facts); Tr. 62:6–8 (same); Tr. 206:19–21 (same). Both Town & Country and BHSH had a 50-50 commission structure—meaning that, on a $100,000 commission, a brokerage would take $50,000 and an agent would be paid the other $50,000. Tr. 54:23–55:2; Tr. 62:12. But while Claud earned no commissions from the rentals she worked on while at Town & Country, BHSH gave her a 10 percent commission for every rental she closed. Tr. 62:16–24.

From the start, Claud brought "great energy" and a "terrific demeanor" to her work. Tr. 466:25 (Nelson testimony). She worked hard to "acquire[] exclusive listings" by "doing paperwork, creating brochures, printing things out, [and] having different documents signed" and doing likewise for her open rental listings. Tr. 514:15–25.

Claud "always attended" staff-wide office meetings and sought out opportunities to talk with her colleagues and supervisors about her listings or ask questions. *See* Tr. 11:16–21; Tr. 70:2–3. Claud saw Comnas once or twice a week, at times emailed Comnas directly with questions, and made a point of speaking with Nelson and Comnas nearly "any time [she] saw them." Tr. 69:14–70:3; Tr. 515:13–14.

BHSH's social media manager Vanessa Leggard—whose work managing the firm's digital communications put her in contact with "all of the agents"—recalled that Claud was "doing a very good job." Tr. 6:10-15; Tr. 8:4; Tr. 11:16. Claud was "one of the few agents that always sat down with [her]" to "create a social media platform" for her listings. Tr. 11:16–21. Leggard also recalled that Claud was almost always in the Southampton office when Leggard came in for meetings or consultations. Tr. 11:17–18. Although Nelson claimed at trial that he was "disappoint[ed]" that Claud was only in the office for "once a month for an hour or two," *see* Tr. 467:2; Tr. 493:12–13, 16–20, I credit Claud's testimony that in fact she regularly

came into the office for "[a]t least 40 hours a week" in addition to the time she spent in the field.[2]  Tr. 514:13.

Claud hit the ground running at BHSH and netted four exclusive sales listings.  Tr. 72:13–19.  These included two land lots in Southampton listed between $500,000 to $600,000; a home at 117 Pulaski Street listed at $1.65 million; and a home listed at 300 Moses Lane for $799,000.  Tr. 72:13–19.

The Pulaski Street house was owned by Reginald Morris, a family friend who had known Claud since she was a child.  Tr. 30:6, 22–23; Tr. 34:11–23.  Claud obtained this listing using the process that Nelson himself advised all new agents to follow: she began her marketing efforts with her "sphere of influence," which included friends and family in the area with whom she had a prior personal connection.  *See* Tr. 502:13–14.

Morris retained Claud not just because of their family ties, but because—after interviewing her at length and putting her through her proverbial paces—he believed that she would ably deliver in this important sale.  *See* Tr. 33:9–12.  And Morris was not disappointed: When asked at trial what she did to market the sale of his home, he responded, "[T]he question would be what she *didn't* do?"  Tr. 33:17 (emphasis added).  Morris found Claud to be "very professional" at all times: among other things, she prepared the listing for his house online and in the local paper, hosted repeated viewings, and did "everything that a realtor had to do."  Tr. 33:17–24.  Morris never found Claud to be bullying, threatening, or rude—even when Claud suggested Morris take offers lower than the asking price and, after further discussions, he declined to follow her advice and continued to hold out for a buyer at or above asking.  Tr. 35:24–36:23.

---

[2] Having viewed their demeanor on the witness stand and having heard the entirety of each witness's testimony on a range of issues, I find Leggard (a disinterested third party) to be more credible than Nelson.  In addition, Nelson's claim at trial that Claud was infrequently in the office is devoid of any external support, such as a negative performance review or any contemporaneous effort by Nelson to note or address this alleged deficiency as her supervisor.

Claud also secured an exclusive listing for $799,000 at 300 Moses Lane—a home owned by an elderly woman named Cassandra Brown. ECF No. 58, at 9. Claud came to know Brown through Brown's nephew Roland, who had worked with Claud's father. Tr. 73:8–9. Brown signed an Exclusive Right to Sell Agreement with BHSH on April 17, 2017, with Claud as the agent. Tr. 149:16–18; Pl.'s Ex. 3.

Claud marketed Brown's house "extensively:" she had photos taken by a professional photographer, prepared and posted sales listings online and in the newspaper, and put a "for sale" sign in the yard that yielded "quite a bit of attention" in that prime location. Tr. 107:12–17. Anticipating that prospective buyers would likely want to make extensive improvements to and expansions of the home that Brown had owned for many years, Claud went to the village zoning department to determine what kind of additions could be made to the property, so that she would be prepared to answer buyers' questions in that regard. Tr. 107:18–21. Claud even went beyond her role to help Brown obtain a Certificate of Occupancy for the property and discuss senior living facilities and other housing alternatives that might be suitable for her after her home was sold. Tr. 107:22–108:3; Tr. 111:12–16.

## 2. Claud experiences repeated negative treatment by her direct supervisor, Robert Nelson

Out of about 130 to 140 real estate agents and fourteen employees working at BHSH in 2016–17, Claud was the only Black agent[3] and one of only two Black employees or agents across BHSH's six offices. Tr. 235:21–236:8; Tr. 239:5–8. At trial, Claud testified about a series of improper or otherwise troubling actions, remarks, and other conduct by Nelson that she experienced over nearly eight months. These included what she perceived to

---

[3] Comnas recalled that at one time BHSH had an affiliation with another Black agent named Gwen Hankin, but was unsure whether Hankin was employed while Claud was at BHSH; in any event, Hankin "didn't really do much in the way of real estate transactions" and was not an "active" agent. Tr. 239:5–24. Unlike an active agent, an inactive salesperson or associate broker licensed by the State of New York could be associated with a firm like BHSH but could not seek listings or take on clients regularly. Tr. 240:17–23.

be (1) inappropriate comments that directly or indirectly referenced her race, as well as (2) disparate supervisory treatment as compared to her other (White) colleagues—dismissive remarks, repeated refusals to mentor Claud, and reduced opportunities to build her real estate portfolio.  Over time, Claud came to believe that what she perceived as a pattern of lesser treatment by Nelson was likely because she was the only Black agent under Nelson's supervision.

The claims presented by Claud at trial do not include a claim for discrimination based on race under § 1981, and so my factual findings about what Claud experienced while Nelson was her supervisor are neither material nor essential to BHSH's potential liability for retaliation under § 1981.  But I note them here because (1) they are relevant to my assessment of Claud's overall credibility, which in turn is highly relevant to resolving the parties' disputes over the reason why Claud's contract was terminated (*i.e.,* whether that reason was a pretext for retaliation), and (2) they readily establish that Claud had a good-faith basis to raise her concerns about Nelson's treatment of her with Nelson's supervisor, Cia Comnas, and thus that Claud engaged in protected activity under Section 1981 when she did so in June 2017.  Specifically, I found highly credible Claud's testimony as to the following interactions with Nelson between November 2016 and June 2017.

Nelson made comments throughout Claud's employment that made Claud feel "uncomfortable."  Tr. 74:1.  As Claud recounted, she once went into Nelson's office to ask him a question about her work and he pivoted the conversation to a statement that she was "the only Black agent in the Hamptons."  Tr. 74:12–13.  Whether or not that accurately reflected the (under)representation of Black agents in the Hamptons real estate industry at that time, when Nelson invoked Claud's race and singularity for no apparent purpose, it is no surprise that Claud was taken aback by his remark.[4]

---

[4] This is not to suggest (and Claud does not argue) that Nelson could not have invoked an employee's race and singularity for at least potentially-appropriate contexts—such as asking her whether she had encountered

On another occasion, Nelson and Claud discussed her recent efforts to update "open" BHSH rentals that had been inactive for over one year, after which any agent could attempt to represent a listing's owner. *See* Tr. 75:10–12; *see also* Tr. 486:2–5 (Nelson describing open rentals policy). Updating open rentals, which was a standard practice at both BHSH and Claud's prior brokerage, would have allowed Claud to earn commissions on those properties if rented or sold. Tr. 75:6–16; *see also* Tr. 483:6–10 (Nelson explaining that new agents like Claud typically sought open rentals). During that conversation, Nelson stunned Claud by telling her that she was "a pit bull" who "like[s] to take things from others." Tr. 74:17–20. For obvious reasons, Claud found "offensive" that her White supervisor "referred to [her] as a dog" while discussing her professional conduct and practices in a supervisory setting. Tr. 74:17–20. Despite Nelson's remarks, Claud did not immediately report them to Comnas or anyone else at BHSH. Instead, she chose to focus on her efforts to build a successful real estate practice at BHSH.[5]

But in this area, too, Claud experienced repeated difficulties in her interactions with Nelson. As a new agent, she actively sought support and guidance from Nelson in such critical areas as updating listings and determining how best to price properties and how to market herself to and secure exclusive contracts with prospective clients. *See* Tr. 78:3–13; 79:14–80:14.

According to Nelson, Claud never complained to him that he was not providing enough support. He maintained that he "love[d] sitting down with

discrimination, needed additional support from management, or had any suggestions for BHSH as to how to improve racial diversity within the industry. But the record here reflects none of those.

[5] Leggard observed that she found herself around "some agents" who she "felt were being discriminatory towards all different types of people—whether it was homosexuals, whether it was Black people, whether it was Asian people, Latino people." Tr. 22:8–11. Still, to Leggard, the BHSH office culture was such that "you didn't . . . want[] to rock the boat" by raising complaints. *See* Tr. 22:13–14.

anyone to go over ideas" to "increase their business," and the two had "very engaging conversations" to this effect. Tr. 469:12–18. I do not credit Nelson's general or specific denials that he treated Claud as he did all other agents. Instead, based on my observations of her demeanor, recollections, and the content of her testimony, I find highly credible Claud's account of how she repeatedly tried without success to secure Nelson's basic guidance and mentorship in a variety of ways over many months, but was met with largely dismissive or outright hostile conduct on his part.

For example, Claud recounted one instance in which she had spoken to a homeowner who gave Claud the pricing of his home—presumably allowing Claud to update the listing and work on it. Tr. 75:17–21. Claud went into Nelson's office to ask a question and then saw that Nelson had emailed another agent: "Hey, you should look at this." Tr. 75:21–24. That agent ultimately got credit "for the work [Claud] had done." Tr. 75:24–25. In another instance, Claud called a homeowner who had a listing without an agent's name. Tr. 76:2–6. The homeowner told Claud about the listing and Claud updated the listing. Tr. 76:6-7. Nelson then gave the listing to another agent. Tr. 76:7-8. These reassignments happened "repetitive[ly]." Tr. 76:9.

And while it was common at BHSH for a senior manager or broker to accompany a new agent to meet with homeowners and assist in securing a sales listing upon request, Nelson "would not make himself available" to meet with Claud and various homeowners. *See* Tr. 76:12–14; Tr. 77:8–10, 13–16. He did finally agree to come to one meeting with Claud and a prospective client at 40 Broadway in Southampton. *See* Tr. 77:17–18. But midway through the meeting, while the homeowner was elsewhere in the home, Nelson "got up and left" with no explanation; even when Claud implored him privately to stay, he refused to do so. Tr. 77:18–24. Neither the homeowner nor Claud knew why Nelson had left.[6] Tr. 77:25–78:1. Claud felt

_____

[6] Nelson confirmed that he attended the meeting for an hour; claimed that he answered questions with Claud and stated, at some point, that he had another appointment; and maintained that Claud never asked him to stay and left after saying goodbye to the client. Tr. 468:12–24; Tr. 489:20–21;

"humiliat[ed]." Tr. 77:24.  She did not get the listing.  Tr. 77:24–25.

Later, Peter Turino, the president of BHSH, came with Claud to visit to the same homeowner.  Tr. 78:3–4.  As the two walked into the meeting, Turino said that he thought Nelson was a good manager.  Tr. 78:10–12.  Claud decided to let Turino, with whom she thought she had a good relationship, know that her experience had been otherwise; she told Turino that Nelson was not "giv[ing] me the support that I ask him for."  Tr. 78:12–13.  Turino initially "laughed it off," Tr. 78:14, but he stayed with Claud for the entire meeting with the homeowner and tried to "make up for the damage Robert [Nelson] had done."  Tr. 78:5–7.

At another point, Claud came to Turino and shared that she "need[ed] more assistance" as a newer agent but was not getting such assistance from Nelson.  Tr. 78:16–20.  Turino then met with Claud at least biweekly to provide her with some additional support.  Tr. 78:22–24.  Claud asked Turino not to repeat to Nelson what she had said about Nelson's lack of support "for fear of what Robert [Nelson] might do if he knew that I had said that." Tr. 78:25–79:2.

In one meeting, Claud and Turino talked about how to generate leads. Tr. 79:3–5.  A "huge lead generator" for agents was the "Up Board," a "revolving" schedule of which agents would get extremely valuable walk-in or telephone leads from prospective buyers or sellers.  *See* Tr. 85:23–86:14 (defining "Up Board"); Pl.'s Ex. 9, at 21 (BHSH policy manual describing "Up Board Policy").  Agents would be included on the board at the direction of management if they were knowledgeable about inventory and "physically in the office."  Tr. 86:23–87:1; Pl.'s Ex. 9, at 21.  At the meeting, Turino realized Claud's name was not on the Up Board.  Tr. 79:6–8.  In fact, Claud's name was absent "several times:" on "at least four or five" occasions," Turino saw that Claud's name was not on the Up Board (which was kept out of view of the agents themselves) and he promised to talk to Nelson.  *See* Tr. 79:11–13; Tr. 87:2–9.  Because Claud could not see the Up Board, Claud did not know

Tr. 490:3–5.  Based on my observations of Nelson's demeanor and overall credibility, I do not credit his conflicting account of what transpired at this meeting.

whether Turino ever followed through with this promise or whether Nelson listed her on the Up Board thereafter; but to the best of her knowledge, she never got a single lead through the Up Board. Tr. 87:1–2, 15–17.

Another area where Nelson did not support Claud concerned "comps," or help with pricing a client's home correctly. Tr. 80:7–8, 11.  At one point, Claud emailed Nelson to run her proposed pricing by him and get his feedback as to whether she had correctly researched and priced the listing.  Tr. 84:24–85:3.  Nelson called Claud and said, "[Y]our email was as lengthy as a book," and told her to simply "figure it out." Tr. 85:4–5.[7]  At a different point, Claud asked Mark Baron, a senior BHSH agent, for assistance with comps after she had spoken with an owner. Tr. 79:23–25.  "[I]sn't Robert [Nelson] helping you?" asked Baron.  Tr. 80:11.  Claud said no.  Tr. 80:11.  "[T]hat's outrageous," said Baron.  Tr. 80:12.  "[H]e should be offering you way more assistance.  He does to other agents." Tr. 80:13–14.  Baron offered to "escalate[]" Nelson's lack of support, but Claud didn't want him to, as she was "afraid of retaliation." Tr. 80:12–17.  Her wariness of such retaliation also led Claud to refrain from updating open listings, even though, as noted above, doing so was a standard route through which agents earned additional commissions: Claud felt "scared to update listings because [she] would get a lot of pushback and a problem from Robert [Nelson]." Tr. 79:16–18.

Claud's experiences with Nelson led her to seek help from other agents.  One homeowner reached out directly to Claud to ask her to manage his "six-figure rental property." Tr. 81:13–15.  Claud was "too afraid to update it because [she] knew that Robert [Nelson] would give [her] a big problem about it." Tr. 81:15–17.  So she spoke to Ellen Kronemeyer, a colleague at BHSH whose daughters had gone to high school with Claud and who worked with Nelson, about that property and the experience with Nelson at 40 Broadway. Tr. 58:9–16; 81:19–21.  Kronemeyer appeared "surprised,"

---

[7] The transcript of the trial quotes Claud as saying that Nelson told her to "go on and figure it out," but the Plaintiff's proposed findings of fact described this portion of the quotation as "[G]oogle it and figure it out," ECF No. 64, at 11, which is consistent with the Court's recollection of the testimony.  Either way, the message conveyed to Claud by Nelson's response is the same.

and then came with Claud to pitch meetings with potential clients. Tr. 81:22–25.

Similarly, after 117 Pulaski Street became Claud's first exclusive listing, Claud reached out to Nelson for help. He "brushed [her] off." Tr. 82:14. Claud learned from Baron—not her manager, Nelson—that the property might be priced too high at $1.65 million, and again asked Nelson to help her approach Morris to encourage him to lower the price by $200,000. Tr. 82:14–83:1. Nelson refused. Tr. 83:1. Claud then asked John Vitula, a "top agent in Southampton," for help. Tr. 83:4–6. Vitula would "make the time" to meet with Claud and different homeowners. Tr. 83:7–9. He accompanied Claud on subsequent visits—including at least one property at a price point over $1 million. Tr. 83:17–84:3. Meanwhile, Nelson kept meeting with other agents. *See* Tr. 85:10–18.

Nelson also failed to take action to protect the exclusive listings that Claud did manage to obtain on her own. One of those was the property at 117 Pulaski Street: the homeowner, Reginald Morris, had engaged Claud as his exclusive agent, but another agent, Christopher Burnside, listed Morris's house in the system as an open listing. Tr. 87:18–88:3. In so doing, Burnside acted without Morris's permission and violated BHSH policy—and stood to earn 10 percent of any commission Claud would have received. *See* Tr. 88:4–10; Pl.'s Ex. 9, at 5. Claud explained the situation to Nelson, who did nothing. Tr. 88:11-13. Finally, Morris himself informed BHSH, "I did not authorize Christopher Burnside to list this property for an open listing and I want it removed from the system." Tr. 88:14–18. Nelson removed the listing only after Morris complained. Tr. 88:19–21.

### 3. Claud raises her concerns about Nelson's discriminatory treatment directly with his supervisor, Comnas

Claud's informal reports about Nelson's conduct to her colleagues and her efforts to obtain alternative, *ad hoc* supervision and mentorship were ultimately unsatisfactory. Thus, in June 2017, Claud decided that it was time to raise her concerns directly with Nelson's own supervisor, Cia Comnas.

At the time, BHSH had no written policies that advised sales agents or

employees of their rights to be free from discriminatory treatment. The 2017 BHSH Policy Manual, which gave agents detailed guidance on topics such as listings and licensing, contained no provisions whatsoever regarding the company's anti-discrimination policies, let alone where, how, or when to report complaints of discrimination or retaliation. *See* Pl.'s Ex. 9. Nor did Comnas recall BHSH ever providing its agents or employees with any guidance as to how they should or could report discriminatory treatment they personally observed, experienced, or learned about.[8] *See* Tr. 311:17–312:20.

Claud testified that she finally raised her concerns about Nelson to Comnas in a private, in-person meeting on June 14, 2017. *See* Tr. 91:12; Tr. 92:1–93:5. Believing that she could "trust" Comnas to "handle it with integrity," Claud called Comnas that morning and asked if she might be able to speak with her about a "private matter." Tr. 90:25–91:3; Tr. 91:13–15. Comnas said yes and suggested that they meet at the Southampton office approximately fifteen minutes before that day's staff meeting was scheduled to begin. Tr. 91:16–18. When they arrived at the office, Comnas and Claud went outside to meet privately on a back patio. Tr. 92:10–13. In the meeting, Claud told Comnas: "I will be honest with you, [Nelson is] making me—I feel uncomfortable with my race[.]" Tr. 92:13–15. Claud told Comnas that Nelson was "not providing me the support that I see him provide to my White colleagues." Tr. 92:15–16.

She recalled that Comnas "looked extremely surprised." Tr. 92:17. Claud then provided Comnas with additional details—for example, she recounted the time that Nelson had "embarrassed" her in front of a prospective client when he "got up and left in the middle of the meeting" at the client's home. Tr. 92:17–19. By the end of the meeting, however, Comnas "had offered a solution": she would personally give Claud the "help and support" that Nelson had failed to provide. Tr. 93:4–5; Tr. 92:20. Comnas

---

[8] Neither Nelson nor Comnas testified to any such policies, trainings, or guidance given to employees, and BHSH presented no other evidence that they existed. Nelson testified that, if a concern about race discrimination had been raised, either he or Comnas would have called Judy Kaplan, the head of human resources at the company's corporate office. Tr. 472:10–473:1. But they provided no such guidance to agents or employees like Claud.

proposed to Claud that they find a time to meet again, at which point they would "come up with a game plan" for Claud's business development and supervision.  Tr. 92: 19–24.  Claud remembered the takeaway message from Comnas' proposal as: "[I]f he's not helping you, I will."  Tr. 93:4–5.  She agreed to Comnas's proposal, and the meeting ended.  Tr. 92:20–21; Tr. 93:2–5.

For her part, Comnas denied that Claud ever approached her directly with any such concerns about Nelson, on that date or any other.  Tr. 242:5–10.  When shown phone records that appeared to confirm that she and Claud had spoken briefly by telephone on the morning of June 14, 2017—consistent with Claud's testimony that she called that day to request such a meeting—Comnas claimed not to recall whether she met with Claud that day.  Tr. 246: 8-9.  She did recall another occasion in which Claud "came by to see me" at Comnas's primary office in Bridgehampton, for a general "chat" about "how to improve her business."  Tr. 246:5–14.  But Comnas maintained that at no time did Claud ever speak with her about potentially discriminatory treatment by Nelson.  *See* Tr. 242:8–10; 246:8–9.

Having observed the demeanor and heard the live testimony of both Comnas and Claud, I do not credit Comnas's account.  Instead, I found highly credible Claud's detailed, measured testimony that she reluctantly but forthrightly raised these concerns with Comnas in a one-on-one conversation shortly before a staff-wide meeting at BHSH's Southampton office, on or about June 14, 2017.  And I find it incredible that Comnas would not remember that exchange.  Among other reasons Comnas was unlikely to forget such a meeting: Claud was the only Black real estate agent at any of BHSH's offices, and a new one at that; Nelson was the senior manager in the office where Claud worked; Nelson was a longtime colleague of Comnas's and reported directly to her; and Comnas had recommended him for his promotion to Senior Managing Director just two years earlier.  Further, as both the senior hands-on executive at BHSH *and* a lawyer herself, *see* Tr. 237:4–5, 8–10, Comnas would have been well aware of the potential legal liability BHSH faced if Claud's allegations were true but the company failed to take prompt, meaningful action to remedy them.  I thus do not credit Comnas's testimony that she had no recollection of any such meeting with Claud.

Further, there is no evidence that Comnas subsequently did anything to investigate, remedy, or otherwise respond to these serious concerns about possible race discrimination against a senior executive at BHSH—other than to swiftly try and "fix" the problem by summarily terminating Claud's contract with BHSH just two weeks later.

**B.   Claud's termination from BHSH**

Shortly after her June 14 meeting with Comnas, Claud went away for approximately one week on a pre-planned vacation to Montreal. She returned around June 26 or 27 and resumed work on her listings at BHSH. Tr. 93:20–95:3.

After Claud returned, she grew concerned that she had not heard recently from Cassandra Brown, the owner of 300 Moses Lane. Tr. 115:18–21. Claud's efforts to reach Brown ultimately led to a series of phone calls and emails culminating in Claud's termination.

**1.   Claud's call with Brown's daughter, Karen Ham**

On June 29, 2017, having been unable to reach Brown for a few days, Claud reached out to Brown's nephew Roland. Roland gave Claud the phone number for Karen Ham, Brown's daughter. Tr. 115:21–24. Claud had never spoken to Ham before, and Ham's phone number was not on the listing for 300 Moses Lane. Tr. 112:5–7; Tr. 516:7–9, 17–19.

On June 29, Claud called Ham looking for Brown. ECF No. 58, at 9. Ham told Claud that she knew where Brown was and who Claud was, and that she would call Claud back with Brown on the line. *Id.* A few minutes later, Ham did so. *Id.* Claud then said she was calling to "check in" on Brown. Tr. 120:16–17. Rather than let her mother (the property owner) speak, Ham asked Claud about offers and expressed frustration over a reduction in the price of the listing. Tr. 120:20–121:6; Tr. 124:7–11.

This put Claud in a difficult position, since Brown, her client, had earlier given Claud "numerous instructions" not to speak to "anyone else except for her about the sale of the property"—including her own family. Tr. 121:1–3; Tr. 124:18–21; *see also* Tr. 124:21–23 (describing how Brown

"was very adamant" that "[s]he didn't want me talking to anyone else."). When Claud declined to answer her questions directly, Ham became "upset," screaming phrases like "this is F-ing ridiculous" (but using the full expletive for that term) and telling Claud to take the listing off the market. Tr. 121:4–6; Tr. 121:16–19; Tr. 125:4–7. When Claud told Ham that Claud could only take the listing off the market with the owner's authorization, Ham again yelled and cursed at Claud. Tr. 121:7–10.

Claud concluded that the conversation was becoming increasingly difficult and that the best course would be to hang up the phone. She did so. *See* Tr. 125:9–12. While Claud had never had a conversation like that before with a client or client's family member, Claud concluded that nothing inappropriate had happened with respect to her actual client, Cassandra Brown; in fact, she had followed the client's instructions in declining to engage with Ham over the details of the listing. Accordingly, Claud saw no need to immediately report the conversation to Nelson or anyone else at BHSH. Tr. 126:15–20.

## 2.    Comnas speaks with Ham

At or about 7:00 p.m. that same evening, Karen Ham called Comnas. *See* Tr. 248:7–9; Tr. 249:20–25; Tr. 256:2–5. Comnas testified at trial that *both* Ham and Brown called her to voice complaints about Claud—which, if true, might have undercut Claud's testimony about her client's wishes, and given Comnas's purported concerns about Claud's conduct greater credibility. *See* Tr. 247:15–248:11. But numerous aspects of the record contradict Comnas's claim in this regard. First, and most importantly, Comnas's contemporaneous notes from the call clearly say only that "Karen Ham" made the phone call in question about "Shauncy Claud" that evening, and say nothing about Brown being on the line. *See* Pl's Ex. 8 (reflecting "call from Karen Ham re: 300 Moses Lane (mother's home)"); Tr. 252:5–6, 15; *see also* Tr. 253:10–12. The fact that these notes refer to "mother's home" also indicates that Brown herself was not on the line. Similarly, Comnas emailed Nelson about ten minutes after the call and described a call coming from "[a] client" complaining about Claud's behavior to her and "her mother." Pl.'s Ex. 2, at 2.

It is unclear whether Comnas—who acknowledged that she did

nothing to verify Ham's identity or relationship to the property before
terminating Claud's affiliation with BHSH—was at that time under the
mistaken belief that Ham was the co-owner of the property or otherwise a
"client" of BHSH.  But even if she were, it does not change the facts that (1)
Comnas's contemporaneous notes and emails provide clear evidence that the
only person she spoke with that evening was Karen Ham, who was not the
firm's client and had no ownership interest in the property; and (2) Comnas
later gave what I conclude was knowingly false testimony that Brown herself
was on the line and shared in Ham's complaints.  It is my conclusion that
Comnas belatedly claimed that Brown herself was on the call for the purpose
of providing an added veneer of legitimacy to the adverse employment action
she took against Claud on June 29–30.[9]

### 3.    Comnas decides to "fire Shauncy [Claud] ASAP"

In her email to Nelson, which appears to be the only written
correspondence Comnas and Nelson had about firing Claud, Comnas wrote:

> Sorry to disturb you on reunion but wanted you to know that we
> must fire Shauncy ASAP.

> A client whose small exclusive she has on Moses Lane just called

---

[9] To be clear: BHSH would have been entitled to terminate Claud's
contract in response to a single complaint about "rudeness" by a non-client,
whether the complainant was a client's family member or any other person,
including Ham.  But it may only to do so if the complaint was the *actual*
reason for the termination.  As discussed herein, there is overwhelming
evidence on this record that it was not—and that the June 29 phone call was
instead a pretext for unlawful retaliation against Claud.  My discussion of
Comnas's claim that it was Brown and Ham together, not just Ham, who
voiced these alleged complaints on the June 29 phone call is relevant only
insofar as it relates to Comnas's credibility.  But Comnas's credibility is
obviously critical to BHSH's defense and the key disputed issues at trial,
since Comnas is the senior executive (1) to whom Claud alleges she voiced her
concerns about race discrimination two weeks before her termination (but
who denies that this occurred), and (2) who made the ultimate decision to
terminate Claud, after briefly consulting with Nelson.

to tell me how outrageously rude Shauncy was to her and her mother.

It's time for her to go before she can do any more damage.

The client did not want Shauncy to know she had complained as they were a bit afraid of her – so we will have to wait a day or two and then fire her after we have changed the Southampton office lock.  Shauncy is someone who could easily try to break in and do damage after being fired.  SH agents will all get new keys.

Do you want me to wait till you get back? I can do so or I can just get it over with.

Pl.'s Ex. 2, at 1–2; *see also* Tr. 268:6–8.  Nelson replied about four hours later[10]: "Oh no.  Please do it.  Sorry you have to deal with this."  Pl.'s Ex. 2, at 1.  Comnas then replied, "No worries–I have done it many times and this is really an instance where she deserves to go."  *Id.*; *see also* Tr. 269:6–12.

Nelson asked no additional questions about the alleged phone call from the unnamed "client," did not encourage Comnas to speak to Claud and get her side of the story, and did not in any way discourage Comnas from immediately terminating Claud.  To Nelson, hearing a third-hand report that Claud was "outrageously rude" to a client was enough for him to reply to Comnas: "Please, Cia, you deal with it."[11]  Tr. 500:7.

---

[10] Plaintiff's Exhibit 2 shows a 4:10 p.m. email from Comnas to Nelson, followed by a 7:51 p.m. reply from Nelson and an 8:23 p.m. reply to that email from Comnas.  These times translate to 7:10 p.m., 10:51 p.m., and 11:23 p.m., respectively, given Comnas's notes about a call at 7 p.m. and Nelson's testimony about being on vacation in Vancouver, British Columbia, which has a three-hour time difference with Southampton.  *See* Tr. 496:22–497:3.

[11] Comnas said that, before firing an agent, Comnas would have typically notified staff at the New York City corporate offices of Brown Harris Stevens.  Tr. 272:19–273:14; Tr. 313:11–19.  Comnas did not specifically

### 4. Claud is formally terminated, and notified of her termination after the fact

The next day, at some time after 1:57 p.m., Claud opened her email. There, for the first time, Claud was shocked to see an email Comnas had sent to BHSH staff—approximately 140 to 150 people—stating that Claud was "no longer associated with our company." Tr. 127:18–21; *see also* Tr. 276:23–25; Pl.'s Ex. 21.  At 3:05 p.m., Comnas texted Claud to tell her she had sent the above termination notice to Claud's Gmail address.  Tr. 131:18–22.  Claud then checked her personal email and saw that Comnas had emailed Claud at 1:53 p.m., just four minutes before the staff-wide announcement about her termination was transmitted:

> Dear Shauncy,
>
> This email is notice that we have terminated your association with Brown Harris Stevens of the Hamptons, effective immediately.
>
> Items from your desk that looked to be your personal belongings have been placed in a box by our staff and you may pick them up during regular business hours at the Southampton office.
>
> While BHS was not the right fit, we nonetheless wish you well in your future endeavors.
>
> Cia

Pl.'s Ex. 7, at 1.

All of this occurred without warning: Claud testified that no one had discussed her termination with her prior to these emails, and that she had no way of reaching her buyers or accessing her accounts at BHSH.  Tr. 129:22–130:3.  The sudden termination made her "upset" and "emotional." Tr. 129:22–23.  Neither Comnas nor Nelson told her why BHSH had not been

---

recall calling the corporate office here, Tr. 273:12–14, and BHSH offered no evidence that she did so.

the so-called "right fit."  *See* Tr. 163:5–11.

Comnas had no contact with Claud between the time of her call with Ham and the notice-of-termination emails she sent Claud the following day. Comnas claimed that she attempted to reach Claud but was "not able to establish contact" with her on the evening of June 29 or the morning of June 30, 2017, before she emailed the termination announcement to Claud and all other BHSH staff.  Tr. 272:6–9; Tr. 278:25–279:9.

I do not credit Comnas's claim that she tried to speak with Claud but was unable to reach her, for several reasons.  First, Comnas testified that, on the morning of June 30, she asked the two Southampton office administrators to find Claud for her.  *See* Tr. 256:9–258:3.  Yet neither Comnas nor anyone else at BHSH explained why none of the employees or agents at this prominent and busy real estate firm could not connect the senior manager of the region with one of her subordinate agents about a time-sensitive matter, had she in fact requested they do so.

Second, Comnas could not remember whether she tried to call Claud on the evening of June 29 after she made her decision and claimed not to recall whether she even had Claud's cell phone number.  Tr. 258:5–7, 9–10; Tr. 269:24–25.  She later said that she "may have tried to reach out" to Claud between her 7:10 p.m. and 11:51 p.m. emails.  Tr. 269:24–25.  But, when shown Claud's cell phone records, Comnas could not say that any of the missed or completed calls to Claud's cell phone from June 29, 2017, 6:26 p.m., to June 30, 2017, 1:21 p.m. came from BHSH phone numbers, including hers. *See* Tr. 322:20–323:3; Tr. 324:1–4; Tr. 325:10–326:22.

It strains belief that Comnas could not have reached Claud that evening or early the next morning had she in fact attempted to do so as she claims.  Even if the phone records do not reflect any missed calls to Claud's cell phone, Comnas could have surely followed up with a brief text or email asking Claud to call her immediately.  It strains credulity that in June 2017, the senior manager of a prominent real estate firm would not have expected her agents to be checking email, texts, or both with great frequency— especially in the Hamptons, in the height of the summer season.  Indeed, as the trial exhibits demonstrated, Comnas and Claud had texted directly about another property that same year, with at least one text sent by Comnas just

nine days before she terminated Claud.  *See* Pl.'s Ex. 20 (showing text exchanges from January 21, 2017, and June 21, 2017).  And Comnas *did* text Claud to confirm receipt of the termination notice *after* it was sent out on June 30.  *Id.*; Tr. 277:13–278:21.

At 3:39 p.m., less than an hour after texting Claud to advise her of her termination, Comnas emailed BHSH agent Jennifer Wisner about taking over the Cassandra Brown listing at 300 Moses Lane.  *See* Tr. 302:19–303:4; Pl.'s Ex. 6.  Comnas started the email: "The daughter's name is Karen Ham" and gave Ham's phone number.  Tr. 303:13–16.  Comnas said she gave Ham's phone number because it was "the primary contact number that I had on hand myself."  Tr. 303:17–19.  But Claud testified—without contradiction— that Ham's number was not the number on the listing, which she explained only listed the owner's—Brown's—number.  *See* Tr. 515:17–516:21.

Comnas continued the email: "As I mentioned, [Ham] is getting a Power of Attorney for her elderly mother (Cassandra Brown—the owner) and in the meantime, you can probably speak with both her mother and her together."  *See* Pl.'s Ex. 6.  Comnas had no basis to question Brown's competency to manage her own personal or financial affairs, nor Brown's ability to continue to serve as the firm's sole contact for the sale of 300 Moses Lane.  Tr. 305:8–16.  But, as Comnas was aware, Ham having power of attorney would have empowered her to sell the property without Brown's consent or involvement.  *See* Tr. 305:23–306:4.  This power would also make Ham, not Brown, the "client" of BHSH—*i.e.*, the position that Comnas had (incorrectly) represented Ham that already held when she emailed Nelson on June 29.  *See* Tr. 305:23–306:4; Pl.'s Ex. 6.

On or about July 3 or 4, Claud went to pick up her belongings from the BHSH Southampton office.  Tr. 164:12.  She entered the office, collected a box of her belongings, and did not speak about her termination with Comnas, Nelson, or any other BHSH staff.  Tr. 163:19–164:6.

At trial, BHSH argued that Claud's credibility was questionable because she did not recontact BHSH in the days or weeks after she was fired to seek further explanation as to the reason(s) for her termination.  Defense counsel characterized Claud as someone who is "very sensitive to race" and "look[s] at the world through race-colored glasses[.]"  Tr. 551:19–24.  Counsel

argued that if someone with this purported worldview who, like Claud, had in fact made a claim of race discrimination to her employer two weeks earlier, the logical next step would have been to ask the employer whether her termination was because of this recent complaint.  *See* Tr. 552:1–553:10.

I find no merit to BHSH's claim.  First, there is no evidence to support counsel's characterization of Claud as "very sensitive to race" or as someone who "looks at the world with race-colored glasses."  The only conceivable evidence from Claud's entire life history or tenure with BHSH upon which counsel could conceivably rely to support this assertion is her June 2017 report to Comnas about Nelson's treatment of her—which, if it occurred as Claud claimed, is hardly the product of a "sensitive" or "distorted" perception, Tr. 551:20, 24, but was instead a measured, highly detailed account that any objective observer would find troubling, and which Claud quite reasonably concluded may have been due to her race.  Second, it is hardly unreasonable to conclude that a person in Claud's position—*i.e.*, who was publicly fired without explanation, shortly after making a complaint about race discrimination to the same executive who terminated her—would have done exactly what Claud did here: retain counsel to investigate and litigate the matter on her behalf.

### 5. Additional evidence undermining Comnas's credibility

In addition to the foregoing, there were several other aspects of Comnas's testimony that seriously undermined her credibility.  Comnas briefly solicited Nelson's input by email when she first decided to fire Claud, but was, by all accounts, the sole and final decisionmaker behind Claud's termination.  And since Comnas's email correspondence, notes, and trial testimony were the key evidence (and in many respects, the sole evidence) offered by BHSH at trial as to how, when, and why that decision was made, her credibility is essential to resolving the question of whether the reason BHSH cites for firing Claud was pretextual.

First, Comnas gave what I find to be flatly incredible testimony in which she claimed a total lack of recollection regarding another high-profile incident involving a different BHSH real estate agent: a White agent named Roxanne Briggs, who remains affiliated with the firm to this day.  Tr. 329:19–

330:6.  At trial, Plaintiff's counsel sought to contrast Comnas's immediate decision to terminate Claud's contract based on a single phone call from a previously unknown source with the very different way Comnas and the firm treated Briggs, after Briggs was arrested on assault charges following a public altercation in a Hamptons restaurant in which Briggs was alleged to have thrown a wine glass at another customer—allegedly missing her intended target but shattering the glass against the wall.  Tr. 330:9–11; Tr. 331:4–332:18; Tr. 333:17–19.  After Comnas claimed to have no recollection whatsoever of Briggs's arrest or the facts surrounding it, Tr. 330:9–11, she was shown a copy of an article from the widely read "Page Six" gossip column of the *New York Post* dated November 4, 2013, describing Briggs's alleged actions and her arrest in detail.  *See* Tr. 333:17–334:8; Pl.'s Ex. 31.  Yet Comnas still offered no explanation or recollection as to why Briggs remained at the firm after this high-profile and allegedly physically violent incident, while Claud was summarily fired in the wake of a single phone complaint Comnas received from a previously-unknown caller.  She testified only that "[t]hat's what [the article] says" (about Briggs's alleged conduct), that if true, these actions "would not reflect well on" Briggs, and that Briggs would "not necessarily" have been fired as a result of her actions.  Tr. 333:19–334:8.

Whether or not Comnas and BHSH had good reason to continue their affiliation with Briggs after this alleged assault is not the point.  They might well have concluded that Briggs was entitled to remain with the firm while charges were pending but before she was convicted of any crime.  The significance of this testimony is that Comnas's claimed *lack of recollection* about this high-profile incident was not credible.  It prevented Plaintiff from cross-examining her about the firm's treatment of Briggs, so that Plaintiff might contrast it with the actions Comnas so swiftly took against Claud because, she claimed, Claud's alleged conduct was so "shocking."  Tr. 280:3–11.  I find it incredible that Comnas, the senior executive in charge of BHSH's six offices, would not have been well aware of the Briggs incident at the time it was reported.  As the highest-ranking manager of BHSH's Hamptons offices, Comnas would have all but certainly been deeply involved in the firm's discussions of the fallout from the *Post* article: for example, whether Briggs's association with the firm should be suspended or terminated while her criminal charges were pending, and how to mitigate any potential public-

relations damage to the firm from her highly publicized arrest.[12]  That is
particularly so in light of what I found to be credible testimony from BHSH's
former social media director Vanessa Leggard.  Even though she was not
working for BHSH in 2013, Leggard clearly recalled that the Briggs incident
was the "talk all around the town" at the time it occurred, and that when
such an event is reported in a Hamptons newspaper, "everyone knows
everything."  Tr. 14:6–9; Tr. 23:12–13.  In sum, I find it incredible that
Comnas did not know about Briggs's arrest at the time it occurred, and that
she did not still recall that incident at the time she testified at Claud's trial,
even after reviewing a copy of the *Post* article; and that she gave false
testimony when she disclaimed any such recollection of the details of this
high-profile incident.

Second, I did not find credible Comnas's testimony that it was
standard "office policy" to change the locks to BHSH's office(s) every time the
firm terminated one of its agents—an explanation Comnas offered to explain
her emailed June 29 instructions to Nelson to "wait a day or two" to notify
Claud of her firing, in order to give them time to "change[] the Southampton
lock".  *See* Pl.'s Ex. 2, at 2; Tr. 264:10–12.  This claim was unsupported by
any other evidence (such as BHSH manuals) and is difficult to square with
Comnas's own email that discusses her views of Claud specifically.  In the
email, Comnas did not say anything about changing the locks pursuant to
any sort of standard protocol or routine policy; instead, she instructed that
this be done *in Claud's case* based on her own concerns about what Claud
might "do" after learning of her firing.  *See* Pl.'s Ex. 2, at 2.  To Comnas,
Claud was "someone who could easily try to break in and do damage after
being fired."  *See id.*  Yet other than a single phone call from Ham
complaining of Claud's "rudeness," Comnas was aware of no other negative
reports about any aspect of Claud's workplace conduct or professionalism,
and certainly not that Claud had ever been violent.  *See* Tr. 263:11–15;

---

[12] The article did not mention Briggs's affiliation with BHSH.  *See* Tr.
333:24–25.  But Comnas conceded that a quick Google search of Briggs's
name by anyone who read the article or otherwise heard about the incident
would have revealed Briggs' affiliation with BHSH, and would not have
reflected well on the firm.  Tr. 334:2–5.

Tr. 264:19–20; Tr. 265:1–6.  And BHSH offered no evidence from Comnas or any other source to justify the claim in her email to Nelson that Claud was the "sort of person" likely to commit an illegal "break in" or intentionally damage the property of a former employer.

I conclude, instead, that Comnas falsely claimed that this procedure was simply "office policy" to mitigate, *post hoc*, the derogatory and unsupported statements she had earlier made about Claud in her change-the-locks email to Nelson on June 29.  It is not for this Court to say whether Comnas's views on Claud's alleged temperament and propensities were rooted in false stereotypes or biases about Black women that she may have harbored, even unconsciously; Claud is not claiming that such bias is the reason why she was fired.  But there is ample evidence supporting the conclusion that any "damage" Comnas may have actually feared Claud might cause to BHSH was not based on what she was told in her brief call with Ham—but was, instead, based on what Comnas had reason to fear might be the fallout from Claud's earlier complaints about apparent race discrimination by a senior manager at BHSH.[13]

Third, Comnas's credibility is undermined by how quickly she acted to fire Claud under these circumstances.  Comnas testified that she did not even consider any other form of discipline or lesser sanction than firing because the behavior Ham described was so "shocking."  *See* Tr. 280:3–11.  While Comnas was not legally required to consider lesser sanctions, Comnas confirmed that she had heard no complaints whatsoever about Claud's

---

[13] As an attorney and the Executive Managing Director, Comnas was no doubt aware that the Claud's complaints about Nelson could have broad implications for the firm, even beyond any individual claims that might have been brought by Claud.  Nelson was not just Claud's supervisor but the senior BHSH official in its Southampton office, and he played a key role in hiring other agents (as he did with Claud).  Tr. 465:13–19.  Given that the firm had only one Black agent in all of its offices, evidence that Nelson treated his supervisees differently based on race could well have opened up a broader inquiry into his hiring practices.  And Comnas was not only Nelson's direct supervisor at the time, but was the person who recommended he be promoted to Senior Managing Director in 2015.  Tr. 479:16–481:20.

performance, interpersonal dynamics, or anything else that would give rise to concerns about her role as an agent with BHSH prior to June 29. In my view, this unblemished history makes it all the more unlikely that Comnas would *immediately* take the most draconian step available to her—sending an email within minutes announcing that "we must fire [Claud] ASAP"—and that she would do so (1) based on a single, uncorroborated conversation with a person with whom she had never spoken (and who was not even a client of the firm), and (2) without at least speaking with Claud and/or the firm's actual client to get more information and hear Claud's version of events. *See* Tr. 281:2–7. Instead, her actions are far more consistent with those of a manager who seized on a single negative phone call as an opportunity to terminate the firm's association with its only Black agent, just weeks after that agent had lodged a serious, detailed complaint about discrimination based on race by her direct supervisor.

### C.   Aftermath

After being terminated by BHSH, Claud tried her best to stay in the real estate profession. But, with her reputation "tarnished," Claud's trajectory changed. *See* Tr. 165:10.

#### 1.   Claud accepts a new position with Nest Seekers International

Less than a year after BHSH had recruited her as an agent with significant potential and longstanding ties to the community, Claud tried but failed to secure a position as a real estate agent with similarly prominent firms in the region like Compass, Douglas Elliman, and Corcoran. Tr. 138:20–21. She eventually accepted a contract as an independent agent with Nest Seekers International, which Claud described as a "lower-level company" with a less lucrative portfolio and significantly lower profile in the real estate market than BHSH. *See* Pl.'s Ex. 4; Tr. 139:21. Claud was associated with Nest Seekers for two years, Tr. 164:19–20, but only worked there full-time for four to five weeks. Tr. 164:23–165:1.

Claud stopped her full-time work there after struggling to secure the kinds of listings she would need to make a living as a full-time agent. For instance, Claud recalled her former client Reginald Morris, the owner of 117

Pulaski Street, telling her, "I don't see Nest Seekers signs as frequently as I saw [sic] Brown Harris Stevens signs." Tr. 167:4–6. To Morris, this made BHSH the "better company"—and it was Claud's impression that he and other homeowners "wanted one of the best companies to represent them." Tr. 167:8–10. Morris ultimately stayed with the more prominent firm, BHSH, and sold his house for $1.525 million. Tr. 35:5–7. But Morris himself recalled how he was disappointed that the sale went to another agent after Claud had done "so much work to sell [his] house." Tr. 40:21–41:8.

When they learned she was no longer affiliated with BHSH, prospective clients asked Claud why that was the case. Tr. 168:13–14. Having received no explanation from BHSH as to why she was terminated (having been told only by Comnas that BHSH was not "the right fit," *see* Pl.'s Ex. 7, at 1), Claud could not give a reasonable, reputation-saving answer to prospective clients. Nor could she explain to them that she had left Town & Country for a more lucrative opportunity at BHSH without having an explanation as to why she had so quickly left BHSH in turn. Tr. 168:11–14; Tr. 168:20–169:3.[14] One East Hampton homeowner with whom Claud had developed "a good, professional relationship" ultimately declined to retain Claud to sell her home and explained to Claud: "[Y]ou were just at Brown Harris Stevens, now you're at Nest Seekers, and formerly you were at Town & Country. That is not consistent. I need an agent who is consistently at the same place." Tr. 166:19–167:1.

Based on comments like these and her own understanding of the real estate market, Claud concluded that no matter how hard she worked or how talented she might be, she would have great difficulty overcoming prospective

---

[14] Defense counsel objected on hearsay grounds to portions of Claud's testimony that concerned conversations she had with third parties, including prospective clients, after her termination. Tr. 169:6–7. To the extent such statements are relied upon by me, they are received in evidence not for their truth, but for their effect on the listener, *i.e.,* the basis for Claud's belief that she had no viable prospects for a viable real estate career after her termination from BHSH and her subsequent decision to return to school, and as evidence in support of her claims of emotional distress (such humiliation and anxiety), as relevant to damages.

clients' negative perceptions of her short tenure at BHSH.  *See* Tr. 166:4–9
("[A]fter [BHSH] wrongfully terminated me, people saw that I was in three
companies in two years.  That's a lot . . . [I]t looks like I hop from company to
company.  That looks like they're going to sign a listing with me and in four
months I might be out of there.  It doesn't look like I am consistent.").[15]

---

[15] At trial, Claud also sought to introduce evidence undermining
BHSH's proffered reason for firing her by showing that Cassandra Brown
herself continued to maintain a good relationship with Claud even after her
termination.  Specifically, Claud offered testimony and certain documents to
establish that Brown sent a letter to BHSH after Claud's termination ending
her relationship with the firm and instructing BHSH that she wished to
retain Claud as the agent on the sale of her home (although at some future
date the firm was apparently advised by either Brown or her daughter Ham
that BHSH would retain the listing, and did so), which BHSH received at
some point after July 12, 2017.  *See* Pl.'s Ex. 5; Tr. 149:16–18; Tr. 150:18–21;
Tr. 310:8–19.  Claud also attempted to show that Brown so trusted Claud
that even after her termination, she gave Suffolk County police her name as
an emergency contact and asked them to contact Claud to come to her home
after Brown fell, which Claud did.  *See* Tr. 140:22–141:2; Tr. 416:3–14; Tr.
419:19–21.

I do not rely on this evidence in my findings for several reasons.  First,
while some of the evidence offered was not hearsay, a significant portion of
what was proffered was hearsay not subject to any exceptions (for example,
testimony that Claud received a phone call from Suffolk County police, who
told her that Brown had fallen, given them her name, and asked her to come
to the Brown home).  Second, even if admissible and true, evidence of Brown's
actions and feelings towards Claud are not relevant to whether Comnas had
a good faith belief *at the time she terminated Claud* that Claud had behaved
"rudely" towards Brown and/or Ham.  Comnas was legally entitled to rely on
a single negative phone call without doing any further investigation and to
fire Claud for that reason—as long as that phone call was the actual reason
for her decision.  Because of these admissibility and relevance problems, and
because I find that the other evidence at trial was more than sufficient to
meet Claud's burden of establishing that Comnas's claim that she fired Claud

### 2.    Claud leaves the real estate profession

Claud's time at BHSH left her financially disadvantaged and emotionally drained.  From commissions, Claud had earned a few thousand dollars in her first year at Town & Country, and between $20,000 to $30,000 in her second year.  Tr. 55:7–11.  Then, at BHSH for the nearly eight months between November 7, 2016, to June 30, 2017, Claud earned—and was fully paid for—$8,067 in commissions.  ECF No. 58, at 8; Tr. 95:13–97:4; Pl.'s Ex. 18.  This came from the sale of one open listing at 26 Flying Point, Water Mill, Southampton, New York; Claud was paid for this sale on June 2, 2017.  Tr. 96:18–25; Pl.'s Ex. 18.  Still, the standard commission for exclusive listings was between 5 to 6 percent of the actual selling price.  *See* Pl.'s Ex. 17, at 2 (Exclusive Right to Sell Agreement for 117 Pulaski Street); Pl.'s Ex. 3, at 3 (Exclusive Right to Sell Agreement for 300 Moses Lane).  Under her agreement with BHSH, Claud was entitled to 50 percent of the commissions BHSH earned on her exclusive listings.  *See* Pl.'s Ex. 9, at 1 (BHSH policy manual describing commission split between an agent and BHSH); Pl.'s Ex. 14, at 1 (Nov. 7, 2016, agreement stating that commissions would be computed under BHSH's policies); Pl.'s Ex. 15, at 1 (April 10, 2017, agreement stating same).  Had she remained at BHSH and completed these sales, these would have included—in addition to any new listings she may have obtained as her reputation and portfolio grew—the following:

- **117 Pulaski Street:** This was listed for $1.695 million and, as Morris recalled, Claud obtained offers ranging from $1.1 million to $1.5 million.  Tr. 34:9–18; Tr., 72:9–73:15; *see also* Pl.'s Ex. 17, at 2.  The owner declined these offers, and Claud continued to market the property before she was terminated.  *See* Tr. 36:4–5; Tr. 97:5–9.  It eventually sold for $1.525 million.  Tr. 35:5–7.

- **300 Moses Lane:** This was listed for $799,000.  Tr. 72:9–16.  Claud ultimately obtained four offers in the range of $500,000 each.  Tr. 108:4–23.

---

because of the June 29 phone call was pretextual, I do not consider the post-June 30 evidence regarding Claud's interactions with Brown in my findings.

- **Two land lots in Southampton:** These were listed for between $500,000 to $600,000.  Tr. 72:16–19.

In the first seven months Claud was at Nest Seekers, she made $10,851 in commissions.  ECF No. 58, at 10.  But she was unable to get any of her exclusive listings from BHSH back.  Tr. 168:15–18.

Claud also gave detailed and credible testimony as to the emotional toll of her termination.  She was devastated by the sudden derailment of her quest to become a real estate broker in the community where she was born and raised: "They took everything from me that I worked for."  Tr. 172:6–7.  Throughout her testimony, and from the accounts of those who knew and worked with her, a clear picture emerged of Claud's potential for success prior to her termination.  The trial evidence established Claud to be a highly motivated and creative young professional who was eager to learn and relished the challenge of building a successful real estate practice.  It was also clear that Claud had the temperament, work ethic, and community ties to do so, had her tenure at BHSH not been suddenly curtailed.

Claud became increasingly "sad," "depressed," and anxious in the wake of her sudden termination and stalled career.  *See* Tr. 171:19–20; Tr. 174:16.  A former star athlete, she was working out twice a week with a trainer and in "superior shape" before being terminated, but that "totally" changed after her firing.  Tr. 172:3–7.  And six years after being fired, Claud continues to "check work e-mails so frequently because I'm so afraid . . . that "somebody will treat me that cruel[ly] and malicious[ly] again."  Tr. 171:23–172:2.

Claud also described how she has suffered from "lasting humiliation."  Tr. 171:20.  While at BHSH, Claud had "paid hundreds of dollars, maybe a thousand" to create and post a billboard with her photograph and the caption "Shauncy Claud, Brown Harris Stevens" at the Southampton Racquetball and Tennis Club.  Tr. 168:7–10.  Claud described, with evident pride, how people she knew from the club had seen the billboard and called her to say "oh, this is great."  Tr. 168:10–11.  But when she was terminated, the billboard was taken down and "people asked, 'What happened, you're not with this company anymore?'"  Tr. 168:10–14.  Having to keep her answers to questions like this "vague"—"especially with respect to potential clients"—proved to be "embarrassing."  Tr. 168:24–169:5.  As a result, Claud ultimately

made the painful decision to abandon her goal of becoming a successful real estate broker in the Hamptons.[16]  *See* Tr. 170:19–171:4.

Claud also presented substantial testimony regarding her emotional damages from Donna Fodera, LCSW.   Before Claud began working at BHSH, she was treated on a short-term basis by Fodera,[17] a licensed clinical social worker and experienced psychotherapist.   Fodera had treated Claud from approximately 2014 until 2015[18] for what Fodera described as "typical" symptoms of mild anxiety in a young person who was no longer in college and figuring out her early career path: "what they want to do in their life, and where they fit in the world, things like that." Tr. 340:5–17.   It was "nothing that raised a suspicion with me that it couldn't be handled with . . . talk therapy." Tr. 340:19–20.   Their sessions ended when Fodera took medical

---

[16] Claud alleged that she learned from various sources, including a senior director in the Hamptons real estate industry, that "other companies wouldn't hire me because Brown Harris Stevens blacklisted me," *i.e.*, that BHSH had told other Hamptons brokerages that it had "fired [Claud] and not to hire [Claud]" to stop her efforts "to get a similar job within our brokerage community."  *See* Tr. 136:5–7; Tr. 138:6–139:9; Tr. 226:14–20.

I do not rely on Claud's statement about what others in the industry told her about BHSH's actions for the truth of whether or not she was "blacklisted."  But I admit her statement for the impact that information leading her to believe she had been "blacklisted" had on Claud's state of mind and subsequent actions—namely, as discussed below, her decision to return to school because she concluded that she no longer had realistic prospects of building a successful real estate career in the Hamptons.

[17] I qualified Fodera as an expert witness under Federal Rule of Evidence 702.  *See* Tr. 342:15; Tr. 353:18; Tr. 364:24–365:9.  Fodera has a college degree in psychology and a master's degree in social work, is a licensed clinical social worker, and has worked as a psychotherapist for over 15 years.  Tr. 338:9–19.

[18] Fodera did not have complete records from her treatment of Claud during this time but was able to locate notes from March 2015 that documented at least three sessions with Claud.  Tr. 341:2–4.

leave to have cancer surgery in March 2015. Tr. 341:5–8. She did not refer Claud to another therapist, because she had "no concern" about Claud's mental health at that time. Tr. 341:10–17.

That changed after Claud's termination from BHSH. Claud, who had last seen Fodera in March 2015, reached out to Fodera in September 2017 and "begg[ed]" to see her again. Tr. 342:13–343:6, 344:14–18. Although Fodera was undergoing chemotherapy, she agreed to see Claud on a short-term basis in light of the urgent circumstances. *See* Tr. 343:4–19, 354:16–25. Fodera's testimony credibly and powerfully corroborated Claud's account of her pain, suffering, and anxiety following her termination. *See* Tr. 356:10–23. As Fodera observed, Claud suffered from an inability to sleep, extreme anxiety, hopelessness, feelings of dread, self-loathing, and shame. Tr. 344:17–18; Tr. 356:6–10. In her second session with Fodera, for example, Claud reflected on the fact that "someone else at the job wasn't terminated [for alleged misconduct] and that [Claud] was," making her wonder, "is this racism?" Tr. 344:9–13. To Fodera, Claud's "sense of self" appeared "destroyed" after BHSH fired her. *See* Tr. 366:10–12. Fodera observed Claud —who had been given no explanation at that time as to why she was terminated—eventually come to the conclusion that her firing may have been because of "racial discrimination." Tr. 353:10. "That hit [Claud] hard and we talked about that." *See* Tr. 398:18–20. Fodera ultimately diagnosed Claud with Post-Traumatic Stress Disorder ("PTSD").[19] *See* Tr. 352:13–14.

---

[19] Claud offered into evidence an April 24, 2018, letter from Fodera summarizing her treatment notes; defendant objected that the letter was not contemporaneous with Fodera's treatment of Claud and was prepared in anticipation of litigation. *See* Tr. 347:6–351:5; Tr. 361:22–362:19, Tr. 363:6–10; Tr. 402–04. I sustained defendant's objection and declined to admit the letter. Tr. 404:23–24. However, Fodera had a clear, independent recollection of her treatment of Claud. I credit her recollection that she wrote "PTSD" in her treatment notes and preparing insurance paperwork with that diagnosis, despite not having saved those notes. *See* Tr. 349:5–18, Tr. 375:13, Tr. 379:4–6. Fodera was undergoing chemotherapy while seeing Claud, yet the chemotherapy did not "negative[ly] impact" Fodera's memory. Tr. 369:2–4.

In September 2017, while in treatment with Fodera, Claud started taking college classes again.  *See* Tr. 170:16–19.  A few months later, in January 2018, she enrolled as a full-time student at SUNY Oswego.  Tr. 170:20–171:1.  The next year, in December 2019, she completed her undergraduate degree in finance and economics, graduating with a 3.7 GPA and honors.  Tr. 196:12–13.  While at SUNY Oswego, she became the chief financial officer of her school's investment club and was a member of the Women in Business committee.  Tr. 196:24–197:3.

Yet Claud's decision to return to school was not without challenges. She no longer lived close to her extended family, as SUNY Oswego was seven hours away from the Hamptons.  *See* Tr. 172:18–20.  Claud continued to suffer from depression and anxiety and saw additional therapists—and continues to see one to this day.  Tr. 173:1–8.  On the recommendation of one of her therapists, she also consulted with a psychopharmacologist, and was prescribed sertraline medication to assist with anxiety and depression. Tr. 173:17–174:16.

In 2021, Claud moved to Atlanta, Georgia, where she resides today. Tr. 45.  She is currently pursuing a master's degree in legal studies at West Virginia University.  Claud began taking courses in May 2022 and at the time of trial held a 4.0 grade point average. Tr. 197–98.

## II.   CONCLUSIONS OF LAW

Under the Agreement, Claud was an at-will agent: at any time, she or BHSH could end her association with BHSH for any non-discriminatory reason.  ECF No. 58, at 8; Pl's. Exs. 14, 15 (Independent Agent Agreements). As all parties agree, the sole issue in dispute is whether BHSH, in terminating Claud, did so in retaliation against her for reporting her

---

Ultimately, however, whether Claud met the full diagnostic criteria for PTSD and was contemporaneously diagnosed as such by Fodera is not essential to my assessment of Claud's non-economic damages.  Regardless of her formal diagnosis, there is no question that Claud suffered from significant, deleterious, and prolonged mental health effects because of her termination from BHSH.

concerns about race discrimination at BHSH, in violation of 42 U.S.C. § 1981. *See* ECF No. 58, at 3–4; Pl. Proposed Conclusions of Law, ECF No. 65; Def. Proposed Conclusions of Law, ECF No. 66.  More specifically, the parties agree that the outcome of this trial turns on whether the evidence shows that BHSH's proffered reason for terminating Claud's contract—that she was "rude" to a client and/or the client's daughter, as reportedly asserted in a phone call to Comnas on June 29, 2017—was the actual reason for Claud's termination, or whether it was instead a pretext for BHSH's unlawful retaliation against her.

As discussed *infra*, I find that Claud has readily met her burden of proving pretext under § 1981.  Claud has proven by a preponderance of the evidence that BHSH intentionally retaliated against her after she complained of discriminatory treatment in the workplace on or about June 14, 2017, and terminated her for that reason, not because of the information Comnas allegedly learned about Claud's "rudeness" in a June 29, 2017, phone call.  I further find that Claud is entitled to an award of both compensatory and punitive damages.

### A.    Liability under Section 1981

Section 1981 protects the rights of all persons—regardless of race—to make and enforce contracts, and, in doing so, to be free from retaliation.  *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008).  Here, Claud argues that she engaged in an activity protected under § 1981 when she reported her concerns about what she perceived as a pattern of discriminatory treatment towards her by a White supervisor, and that BHSH terminated her because she engaged in that protected activity.

### 1.    Background

The history and tradition of § 1981 bear on the retaliation claim at issue in this case.  Just after the Civil War, Congress passed the Civil Rights Act of 1866 to guarantee then-newly freed slaves the "same legal rights that other citizens enjoy."  *See Humphries*, 553 U.S. at 448.  In its original form, § 1981 provided:

All persons within the jurisdiction of the United States shall have

the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 260–61 (2d Cir. 2000) (quoting *Runyon v. McCrary*, 417 U.S. 160, 164 n.1 (1976) (setting forth statute)).  One hundred and twenty-three years after the passage of § 1981, the U.S. Supreme Court limited the scope of § 1981 from applying to "conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 260 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989)).  *Patterson*, left unchecked, would have excluded retaliation claims from § 1981.  *See Humphries*, 553 U.S. at 451.

But Congress responded.  In 1991, Congress added a new subsection (b) to § 1981 that defined "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* at 450.  With this language, Congress sought to "bar all racial discrimination in contracts"—including "retaliation."  H.R. Rep. 102-40, 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 730–31.  The Second Circuit and circuits across the country then concluded that § 1981 encompassed retaliation claims, and, in 2008, the U.S. Supreme Court followed suit.  *See Humphries*, 553 U.S. at 451 (citing *inter alia Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998)).

Second Circuit courts analyze retaliation claims under § 1981 using the same burden-shifting framework that applies to Title VII retaliation claims: *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Hicks v. Baines*, 593 F.3d 159, 163–64 (2d Cir. 2010).  A plaintiff must first establish a prima facie case of retaliation.  *See Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) (citing *Hicks*, 593 F.3d at 164).  This creates a "presumption of retaliation," and the defendant employer then bears the burden to offer a "legitimate, non-retaliatory reason" for its action.  *Ya-Chen*

*Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015).  If the defendant does so, the presumption "dissipates," and the plaintiff then has the burden to show "that the desire to retaliate was the but-for cause of the challenged employment action"—that the retaliation was pretextual.  *Id.*  Of course, *McDonnell Douglas* is "not a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed."  *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

### 2.      Prima facie case

To establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (quoting *Hicks*, 593 F.3d at 164).  A plaintiff's burden at this step is "minimal" and "not onerous."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

To show participation in a (1) protected activity of which (2) an employer is aware, a plaintiff must show that she opposed statutorily prohibited discrimination in a way that "put the employer on notice" that "the employee feels that [the employee] has been the object of discrimination." *Fouche v. St. Charles Hosp.*, 64 F. Supp. 3d 452, 458 (E.D.N.Y. 2014) (quoting *Hayes v. Cablevision Sys. New York City Corp.*, No. 07-CV-2438 (RRM), 2012 WL 1106850, at *16 (E.D.N.Y. Mar. 31, 2012)).  A plaintiff may show evidence of "informal protests of discriminatory employment practices, including making complaints to management."  *See Littlejohn*, 795 F.3d at 317 (citation omitted).

Here, Defendant does not dispute that *if* Claud approached Cia Comnas—or any other person in BHSH management—to report concerns about what she viewed as a pattern of discriminatory treatment by Nelson based on race, she satisfies these elements of her *prima facie* case. Defendant also agrees that Claud need not show that Nelson had

discriminated against her, but only that she held a good-faith belief that Nelson had engaged (or was engaging) in such discriminatory conduct. Defendant argues instead that Claud never communicated any such concern to Comnas, whether on June 14, 2017, or at any other time before her termination.

In line with my factual findings, however, I find that Claud has satisfied the first two prima facie elements. Claud met with Comnas on June 14, 2017, to discuss her concerns about Nelson's conduct towards her. Tr. 91:12–92:16. At that meeting, she clearly and specifically articulated her belief that, *inter alia,* Nelson had not provided "the support that I see him provide to my White colleagues." *See* Tr. 92:14–16. Claud thus engaged in a protected activity that gave BHSH "general corporate knowledge that plaintiff had engaged in a protected activity." *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000).

Claud has also met her burden under the remaining prima facie elements: she suffered a (3) adverse employment action when her association with BHSH was terminated, and (4) has shown a causal connection between the protected activity and the adverse employment action. A plaintiff can show a causal connection in a retaliation claim either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon*, 232 F.3d at 117). The Second Circuit has not "drawn a bright line to define the outer limits" of when a protected activity and retaliation might be "too attenuated to establish a causal relationship," *id.*, but courts in this circuit have upheld causal inferences based on lapses of up to eight months. *See Caputo v. Copiague Union Free Sch. Dist.*, 218 F. Supp. 3d 186, 194–95 (E.D.N.Y. 2016) (collecting cases). Here, Comnas fired Claud on June 30, just two weeks after Claud met with Comnas to report what she perceived as a longstanding pattern of race discrimination by her direct supervisor. *See* Parts I.A.3 & I.B, *supra*. Claud's termination is clearly close enough in time to Claud's protected activity to infer an indirect causal connection between the two events.

### 3.   Legitimate, non-retaliatory reason

The burden now shifts to BHSH to show a "legitimate, non-retaliatory reason for the adverse employment action." *Ya-Chen Chen*, 805 F.3d at 70. At this stage, a court focuses not on the "truth of the allegations" against a plaintiff, but only on what "*motivated*" the employer. *Vasquez v. Empress Ambulance Serv., Inc*, 835 F.3d 267, 275 (2d Cir. 2016) (citing *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2010)) (emphasis original). The employer bears the burden of production at this stage to "rebut the inference of discrimination that arises from proof of the prima facie case" and to "frame[] the factual issue with sufficient clarity to afford the employee a full and fair opportunity to demonstrate pretext." *Meiri v. Dacon*, 759 F.2d 989, 996–97 (2d Cir. 1985). "To this end, the employer's explanation of its reasons must be clear and specific."[20] *Id.* at 997.

---

[20] Courts have considered "legitimate" a wide range of reasons for employers' actions. *Compare, e.g.*, *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 126 (2d Cir. 2012) (pointing to how a plaintiff "failed to complete projects assigned to him," "spoke to his coworkers in an unprofessional manner," and "failed to follow instructions and often deviated from assigned tasks and questioned the work of others, while failing to complete his own") *and Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 429 (E.D.N.Y. 2012) (finding that "complaints about plaintiff's communication style" and concerns regarding the accuracy of her reports were legitimate, non-discriminatory reasons for termination) *with Ya-Chen Chen*, 805 F.3d at 74–75 (citing an assistant professor's lack of "collegiality" as a legitimate basis for not renewing her contract). It bears noting that the sorts of interpersonal difficulties cited in cases such as these may, in fact, be performance related—or they may not be.

In some contexts, however, an employer's negative assessment of an employee's "professionalism," "civility," or "collegiality" may disguise or be used to justify biases against racial, ethnic, religious, or gender minorities that are "not necessarily job-related." *See* Sahar F. Aziz, *Coercing Assimilation: The Case of Muslim Women of Color*, 18 J. GENDER RACE & JUST. 389, 397 (2016). Courts would do well to scrutinize such reasons when offered to ensure that they are both legitimate and performance-based.

Here, Comnas claims she terminated Claud because of "how outrageously rude Shauncy was to [Ham] and her mother." Pl.'s Ex. 2, at 2; *see also* Tr. 269:13–15. BHSH contends that the termination, while involving an "admittedly unpleasant interaction involving a client," stemmed from "non-discriminatory circumstances." ECF No. 66, at 51.

Under the foregoing caselaw, BHSH has clearly proffered a legitimate, non-retaliatory reason for Claud's termination. If the report of Claud's alleged "rudeness" that Comnas received by phone on June 29, 2017, were the *actual* reason for Claud's termination, that would suffice to rebut Claud's prima facie showing of retaliation and ultimately defeat Claud's retaliation claim on the merits. As discussed below, however, I find that this was not BHSH's actual motivation for firing Claud, but was instead a pretext for retaliation.

### 4.    Pretext

The "viability" of Claud's § 1981 claim "rises [or] falls" under the third *McDonnell Douglas* step, where she must "point to evidence that reasonably supports a finding of prohibited discrimination." *See Phillips v. City of New York*, 304 F. Supp. 3d 305, 313 (E.D.N.Y. 2018) (quoting *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002)). Such a showing "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

At this step, a fact finder "need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993). Instead, the question is simply whether the "articulated purpose [was] the *actual purpose* for the challenged employment-related action." *Id*. at 171. Here, BHSH's articulated reason for firing Claud was not its actual reason. The termination's temporal proximity to Claud's reports of discrimination, procedural irregularities, and circumstantial inconsistencies—all underpinned by the lack of credibility of BHSH's primary decisionmaker— readily meet Claud's burden of establishing that BHSH's reason for firing Claud was pretextual.

**Temporal proximity.**  First, courts have considered temporal proximity to support a finding of pretext.  In *Zann Kwan*, an at-will employee complained of gender discrimination and was fired approximately three weeks after.  737 F.3d at 838–39, 847.  In *Phillips*, a Black assistant commissioner at the New York City fire department told an independent consultant that racial discrimination in the department was broader than prior Title VII litigation had revealed.  304 F. Supp. 3d at 308, 314.  She was fired three days later—a timing that a finder of fact could well find was "not mere coincidence."  *Id.* at 314.  As in these cases, the two-week gap between Claud's complaint and firing supports an inference of retaliation.  *See* ECF No. 65, at 6.

BHSH points to multiple cases in this circuit that essentially explain that "temporal proximity alone is not enough" to establish pretext.  ECF No. 66, at 46 (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014).  This is true.  Still, a plaintiff may rely on "evidence comprising her prima facie case, including temporal proximity . . . coupled with evidence of falsity in the employer's explanations" to support a finding of retaliation.  *Zann Kwan*, 737 F.3d at 847.  Here, the temporal proximity is significant, particularly since Claud was away on a pre-planned vacation for approximately half of the two-week time period that elapsed between these events.  But it is only one factor among many.  I find that such additional evidence is reflected in, among other things, the procedures surrounding Claud's firing and BHSH's inconsistent and incredible explanations behind it.

**Procedural irregularities.**  Second, procedural irregularities in a termination can support a finding of pretext.  *See Desir v. Bd. of Co-op. Educ. Servs. (BOCES) Nassau Cnty.*, 803 F. Supp. 2d 168, 177 (E.D.N.Y. 2011), *aff'd*, 469 F. App'x 66 (2d Cir. 2012).  "[D]epartures from procedural regularity . . . can raise a question as to the good faith process where the departure may reasonably affect the decision."  *Stern v. Trustees of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997).  "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent," a terminated employee "is usually constrained to rely on circumstantial evidence."  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Here, Comnas decided to fire Claud by the time she emailed Nelson—just ten minutes after Ham called Comnas to complain about her earlier phone call with Claud. *See* Tr. 249:20–25; Tr. 256:2–5; Tr. 268:6–8. Of course, Claud was an at-will, independent contractor under the Agreement, which gave BHSH broad latitude to terminate her; neither the Agreement nor any applicable law required BHSH to give Claud prior notice or an opportunity to be heard prior to her firing. *See* Pl's Ex. 14. But plaintiff has still shown that the circumstances suggest significant irregularities—*i.e.*, notable contrasts from the steps that an employer who was *actually* motivated by a good faith belief that an agent like Claud, with a brief but otherwise unblemished tenure at the firm, may have been "rude" to a client's daughter would follow, as opposed to one who was seizing on a pretextual reason to fire that agent.

Among other reasons, it strains credulity that if this single phone call were the actual reason for firing Claud, Comnas would not have at least attempted to speak with Claud to learn her side of the story before summarily terminating her, lest Comnas learn that this had all been a misunderstanding, or (as Claud contends was actually been the case) the "rudeness" was a fabricated allegation by a disgruntled and financially-interested family member of a client. But, as discussed above, I find Comnas's claim that she attempted to reach Claud to be contradicted by the record. *See* Part I.B.4, *supra*.

Another procedural irregularity came when Comnas made a point of informing her subordinate on June 30 that Ham was in the process of getting power of attorney over her mother's financial affairs, within hours of when Claud was terminated. Yet Comnas did so without any evidence that Brown was unable to manage or make decisions about the sale of her home. This further suggests a pattern of post hoc justification of her pretextual actions in firing Claud, *i.e.*, a step she took only after learning that Karen Ham, who made the phone call seized on by BHSH as a reason to fire Claud, was not actually the firm's "client" at all. *See* Part I.B.5, *supra*.

**Inconsistencies.** Third, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846–47 (noting a jury could plausibly infer pretext where a defendant shifted from a change in business focus to a plaintiff's poor performance when giving reasons for terminating a plaintiff). Here, Comnas:

- Claimed the call came from a number (Ham's) matching the number on the Brown home's property listing, yet Claud had never made a call to or from that number before June 30 and could not have entered the number on the listing, *see* Tr. 515:17–516:21;

- Claimed that both Ham (who was not the client with whom BHSH had any contractual relationship) and Brown (the actual client) called her and complained about Claud's conduct, but wrote down only Ham's name in her handwritten call notes and described Ham to Nelson as "[a] client whose small exclusive [Claud had] on Moses Lane just called to tell me how outrageously rude [Claud] was to her and and her mother," *see* Tr. 247:12–18; Pl.'s Ex. 2; Pl.'s Ex. 2, at 2;

- Claimed, at trial, that changing the office locks after an employee's termination was standard office policy, but emailed Nelson on June 29 to specifically direct him to change the lock after Claud's firing, *see* Tr. 263:16–25, because, in Comnas's view, Claud was "someone who could easily try to break in and do damage after being fired," *see* Pl.'s Ex. 2— despite repeatedly admitting that Claud had no history of hostility, violence, or threats towards anyone, *see* Tr. 264:3–20; Tr. 265:1–6; Tr. 269:16–17; and

- Claimed she took this action in part because Claud's "rudeness" reflected poorly on BHSH and meant that Claud "needed" to be fired immediately, but had no way of knowing whether any information about the call had gone beyond Claud, Ham, and Brown. Comnas also claimed to have no recollection of an earlier high-profile incident involving Roxanne Briggs,[21] a White agent who was not terminated

---

[21] At trial, no extrinsic evidence was offered as to Briggs's personnel history. But Leggard and Claud knew that Briggs continued to work at

that was prominently reported in a widely read newspaper (Page Six of the *New York Post*) who was arrested and criminally charged for allegedly throwing a wine glass at another person at a local restaurant, and which was, according to former BHSH employee Leggard, the "talk [of] the town." *See* Part I.B.5, *supra*.

These inconsistencies and contradictions—and the temporal proximity and procedural irregularities—surrounding Claud's firing readily satisfy Claud's burden of rebutting the reason proffered by BHSH for terminating her.

\*      \*      \*

In sum, I conclude that (1) BHSH's proffered reason for firing Claud was, in fact, wholly pretextual, and (2) the actual reason Claud was summarily terminated as an agent with BHSH was retaliation—*i.e.,* a consequence of the fact that Claud had just reported to BHSH's Executive Managing Director, Cia Comnas, what Claud perceived to be a pattern of unlawful race-based discrimination by her direct supervisor, who was also Comnas's close colleague and direct report. The evidence at trial clearly established that BHSH did not fire Claud because of any good-faith concerns about her professionalism or temperament. Instead, BHSH seized on a single negative phone call from a third party as a golden opportunity to terminate the firm's only Black real estate agent, just two weeks after that agent had the courage to raise serious concerns about race discrimination by the Southampton office's senior manager.

Under § 1981, BHSH is thus liable for unlawful retaliation.

## B.   Damages

Section 1981 "provides for awards of compensatory and punitive damages for race-based discrimination," which includes cases in which a plaintiff has established an employer's liability for unlawful retaliation.

_____

BHSH following the incident, and Nelson, who is still at BHSH, confirmed that Briggs continues to work at BHSH. *See* Tr. 27:10–16; Tr. 177:23–178:2; Tr. 508:25–509:9.

*Quintero v. Angels of the World, Inc.*, No. 19-CV-6126 (DG), 2021 WL 4464123, at *13 (E.D.N.Y. Sept. 10, 2021) (citing *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60 (1975)), *report and recommendation adopted sub nom. Quintero v. Stoupas*, No. 19-CV-06126 (DG) (RLM), 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021). Claud seeks $600,000 in compensatory damages—$450,000 of which she asserts can be attributed to lost income and $150,000 for emotional distress—and $100,000 in punitive damages. ECF No. 65, at 9, 13, 14. BHSH contends that "no damages are warranted" because it denies any underlying violation of § 1981. ECF No. 66, at 51.

### 1.   Compensatory damages

In the Civil Rights Act of 1991, Congress stated that "limitations imposed on damage awards under Title VII should 'not be construed to limit the scope of, or the relief available under, section 1981 of this title.'" *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1316–17 (2d Cir. 1995) (quoting 42 U.S.C. § 1981a(b)(4)). Still, as other courts have done, I evaluate economic and non-economic damages informed by Title VII principles where appropriate.

### a.   Economic damages

Back pay serves to "make persons whole for injuries suffered through past discrimination." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) (citation omitted). Unlike Title VII, which limits back pay awards to two years, "§ 1981 permits unlimited backpay." *Tomka*, 66 F.3d at 1316. While Title VII limits damages based on employer size, § 1981 does not. *Id.* A plaintiff seeking back pay "need not prove the amount of loss with mathematical precision," but may recover back pay only to the extent that the evidence offers a "sufficient basis" for estimating an amount "with reasonable certainty." *Sir Speedy, Inc., v. L&P Graphics Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

A court calculates back pay from the date of the discriminatory practice to the date of entry of judgment. *Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir. 1994). Commissions are an "integral part of an employee's compensation" and "must be included in a back pay calculation if they can be predicated with reasonable certainty." *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 874 (S.D.N.Y. 1999) (citation omitted). A court will then see if a

plaintiff fulfilled the duty to mitigate damages by "using reasonable diligence in finding other suitable employment." *Jowers v. DME Interactive Holdings, Inc.*, No. 00 Civ. 4753 LTS KNF, 2006 WL 1408671, at *10 (S.D.N.Y. May 22, 2006) (alterations omitted) (citing *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992)). Here, I discuss Claud's request for back pay, followed by my own calculation of back pay.

**Claud's request.** Claud requested $450,000 in compensatory damages for lost income. ECF No. 65, at 9. Her request is "based on the statement to her by Nelson that the average agent would earn $150,000 per year." *Id.* As discussed *infra*, I find that there is credible evidence that Claud did perform at a high level in her approximately eight months at BHSH, and I recognize that Claud's commission-based income and sudden termination makes it "difficult to calculate her precise damages," as she points out. *See id.* But there are two problems with Claud's request that I calculate damages at an average likely yield of $150,000 per year.

First, while I have no doubt that Claud honestly recalls that Nelson "guaranteed" this amount to her in their first meeting, on this point, I credit Nelson's testimony that he did not make any such promise, because it would not have been his practice to do so when recruiting an independent agent, particularly one with a relatively short tenure in the industry. *Compare* Tr. 58:21–22 *with* Tr. 482:3–6. I believe it is far more likely that Nelson, in his efforts to recruit Claud to BHSH, simply *estimated* $150,000 as the amount that new agent might make from yearly commissions over time if she performed well, and that Claud may be honestly but mistakenly recalling his words as a "guarantee." Nevertheless, because neither Claud nor any other witness testified to any estimate—even a rough one—as to her likely commission rate over time, I cannot rely on such an estimate (based on Claud's memory of what Nelson may have told her in their first meeting) to calculate back pay.

Second, other than her history with the listings she actually obtained while at BHSH, Claud provided little evidence from which I may reasonably estimate what her annual commissions would have been had she not been terminated. Claud contended that, since she "approximately quadrupled her income between years one and two" at Town & Country, her prior brokerage,

it is "not unreasonable" to estimate that Claud would have increased her business (even if not quadrupling her income) each year had she remained at BHSH.  ECF No. 65, at 10.  I agree that a general estimation of increased business over time is a "not unreasonable" assumption—but converting that assumption into an estimated rate of increase over time would require considerable speculation.  Most notably, Claud presented no testimony on projected commissions earned by a broker of comparable experience, community ties, and track record from any expert in the field.  She offered neither a retained expert familiar with the Hamptons real estate market, nor testimony from any of BHSH's own directors or other personnel regarding commissions paid to other (non-terminated) agents with comparable skills, experience, and local connections.  I recognize that Claud has limited financial resources in the wake of her firing and has spent several years as a student in an effort to rebuild her career; these factors may have made it difficult for her to afford the cost of an economic damages expert prior to any finding as to liability.  But I cannot rely on evidence that was not presented to make those calculations.

This leaves Claud's record of exclusive listings, rentals, and sales. Claud sold one open listing for $8,067 in her eight months at BHSH.  Pl.'s Ex. 18.  Claud further contends that if she had been able to stay at BHSH and sell the four exclusive listings she had at the time of her termination, she would have earned $75,625.  ECF No. 65, at 9.  Since the $8,067 from her one completed sale was earned in just under eight months, Claud argues, $8,067 should be doubled and added to her projected agent's commission based on the listed sale prices of her four exclusive listings at BHSH of $75,625, for a one-year income of $91,759.  *Id.* at 10.  In the alternative, Claud requests damages based on the $8,067 she earned at BHSH and $10,851 she earned in her first seven months at Nest Seekers, leading to an estimated annual rate of back pay of $18,918.  *Id.* at 11.  Again, the record does not contain information as to whether all four properties she had secured as exclusive listings at BHSH actually sold and at what price; nor does it include expert testimony, salary/commission averages, or other evidence establishing what an agent in Claud's position in the Hamptons might expect to earn on an annual basis, so I decline to use Claud's formulation as the basis for my calculation of damages.

**Back pay calculation.**  On the current record, Claud's back pay can still be calculated with reasonable precision by estimating her annual commissions based upon the one sale she completed while at BHSH, combined with the known final sale price of one of her four exclusive listings at the time of her termination.  In *Rivera v. Baccarat, Inc.*, one of the few employment discrimination cases in this circuit to consider back pay based on commissions, a Title VII plaintiff had worked at a tableware store and received a salary plus commissions that fluctuated from year to year.  34 F. Supp. 2d at 874.  To identify base compensation for a back pay calculation, the court combined the plaintiff's base pay along with average commissions the plaintiff had earned over her four-year employment.  *Id.*

Unlike the plaintiff's compensation in *Rivera*, Claud's compensation came only from commissions.  *See* Pl.'s Ex. 14, at 1 (detailing commission policy in Agreement); Pl.'s Ex. 15, at 1 (same).  But a conservative estimate based on established sales history for a subset of her portfolio is still feasible. This estimate reflects Claud's work generating leads and cultivating relationships to do so—the work Claud was doing when she was terminated after just under eight months.  Thus, rather than limit Claud's back pay calculation to the $8,067 from Claud's one open listing whose sale was completed prior to her termination, I look to what else the record allows me to conclude with "reasonable certainty" she was likely to have earned from her other listings had she not been terminated.  *See Rivera*, 34 F. Supp. 2d at 874.

Reginald Morris, the owner of 117 Pulaski Street, testified that Claud obtained an offer for $1.5 million and that his house ultimately sold for $1.525 million.  Tr. 34:9–12; Tr. 35:5–7.  Since Morris trusted Claud and had only highly positive things to say about her performance, I find it is reasonably certain that had she not been terminated, Claud would have completed the sale on Morris's home for at least the price at which it eventually sold at another brokerage.  While the date of the sale is not in the record, given the progress Claud had made on the property as of the date of her termination, and the fact that it ultimately sold for only slightly above the last offer she had received, I find it reasonably certain that Claud would have sold the property within the first year of her contract with BHSH had she not been wrongfully terminated in June 2017.  At a sale price of $1.525

million, Claud would have earned half of a five percent commission on that sale ($76,250), or $38,125. *See* Pl.'s Ex. 17, at 2.

By contrast, the record contains no evidence as to whether 300 Moses Lane eventually sold, and at what price; or whether the two Southampton lots sold, and at what price. Thus, I cannot reasonably include estimated commissions from those properties. *See* Tr. 72:9–73:15; Tr. 108:4–23; *see also* Part I.C.2, *supra* (listing properties).

To calculate her estimated base rate of compensation, I add $8,067 from her sale of one open listing to $38,125 from the sale of 117 Pulaski Street, for a total estimated annual base rate of compensation of $46,192. I then divide $46,192 by 52.143 weeks (the average amount of weeks in a year when a 365-day year is divided by 7-day weeks) to calculate her weekly base rate of compensation: $885.87. *See, e.g.*, *Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08 Civ. 10283(PAC)(KNF), 2009 WL 2611950, at *3 (S.D.N.Y. Aug. 18, 2009) (awarding $95,000 in back pay after dividing Title VII plaintiff's $65,000 annual salary by fifty-two weeks to get a base amount of $1,250 per week and multiplying that by seventy-six weeks between the dates of termination and default judgment), *report and recommendation adopted sub nom. Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08 Civ. 10283 (PAC)(KNF), 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009); *Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 150 (E.D.N.Y. 2013) (multiplying plaintiff's $450 weekly income by 4 1/3 weeks, the average amount of weeks in a month, to determine five months of income leading to a Title VII back pay award). From the date of termination to the date of this judgment, 309.71 weeks have elapsed. Had Claud not been wrongly terminated from BHSH, she stood to earn at least $274,367.07 in the intervening years.

It bears noting that the foregoing is an extremely conservative estimate of Claud's economic damages. Given Claud's local contacts, drive, performance history (at both Town & Country and BHSH), it is highly likely that the commissions she earned in her first year at BHSH would have increased substantially—even exponentially—as her business and experience grew. It also seems highly likely that Claud would have earned commissions within her first year on at least one, if not more than one, of the other three exclusive listings that she held at the time of her termination. Still, for the

reasons noted above, the law does not permit me to award damages for a projected increase in commissions that is not supported by a sufficient evidentiary foundation.

As for mitigation of damages, Claud sought employment immediately after BHSH terminated her, and about two weeks later, Claud had secured a new position at Nest Seekers.  ECF No. 58, at 10.  She earned $10,851 in commissions over seven months.  *See id.*  But after making a reasonable determination that her termination from BHSH left her with no viable path to succeed in the Hamptons real estate industry, she left Nest Seekers and the industry soon after, deciding instead to continue her education at SUNY Oswego and West Virginia University.  *See* Tr. 194–98; Part I.C.2, *supra*; *see also Dailey v. Societe Generale*, 108 F.3d 451, 457 (2d Cir. 1997) (holding, in a Title VII case, that a plaintiff had mitigated damages when the plaintiff attended school after "diligent efforts to find work prove[d] fruitless").

Subtracting the $10,851 in commissions that she earned at Nest Seekers from the total of $274,367.07 in estimated commissions she would have earned had she remained at BHSH, Claud is entitled to a total net award of back pay of $263,516.07.

### b.   Non-economic (emotional distress) damages

Courts in the Second Circuit put compensatory damages for emotional distress into three categories—garden-variety, significant, or egregious:

> In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury.  These claims typically lack extraordinary circumstances and are not supported by medical testimony.  Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff.

*Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 546 (2d Cir. 2020) (citations omitted).  To assess whether an award for emotional distress is appropriate, courts consider the "amount, duration, and consequences of the claimant's emotional distress."  *Quintero*, 2021 WL 4464123, at *15 (citations omitted).

Claud experienced significant emotional distress from her wrongful termination.  This included shame and humiliation: Claud received no explanation from BHSH as to why she had been let go, but prospective clients and community members noticed.  *See* Tr. 168:13–14 ("[P]eople asked, they said: What happened, you're not with this company anymore?").  Yet Claud could give no reputation-saving answer and had to "tr[y] to keep it vague" when asked, "especially with respect to potential clients."  Tr. 168:24–169:1.

After filing this lawsuit, she also suffered the embarrassment of learning that Comnas, a former supervisor and senior executive whom she "trust[ed]" and believed she could confide in, *see* Tr. 91:3, had referred to her in an email as "the type of person who could come back and do damage," *see* Pl.'s Ex. 2, at 2, and whose alleged potential for destruction led Comnas to change the office locks and provide new keys to all of Claud's former colleagues.  *See id.*

Claud also experienced clinically significant depression and anxiety for an extended period of time in the wake of her firing.  She found it "hard to sleep," and "even to this day, [she] check[s] work emails so frequently because [she is] so afraid" of being fired again and keeps remembering the words of Comnas's email: "Shauncy Claud is no longer with the company."  Tr. 171:23–172:2.  Claud stopped biweekly workouts with her trainer and she found herself in a "different physical state" where she "felt depression."  Tr. 172:3–6.  That persistent condition led Claud to be prescribed sertraline medication, an antidepressant.  *See* Tr. 173:17–174:16.

These protracted symptoms led Claud to resume treatment with her former therapist, Donna Fodera—who saw Claud even while she herself was undergoing cancer treatment, because it was clear that her former patient was in such distress.  Tr. 342:13–343:19 ("She wasn't sleeping.  She was feeling hopeless.  And she was literally begging me to see her again.").  Fodera's testimony was significant in terms of proving damages because she

had a clinical baseline from which to evaluate Claud's mental health before and after her tenure with BHSH.   She powerfully corroborated Claud's account that she suffered a significant decline in this regard because of her termination.  Fodera described Claud's pain, suffering, and anxiety following termination by, for example, recounting how Claud suffered from an inability to sleep, extreme anxiety, hopelessness, feelings of dread, self-loathing, and shame.  *See* Tr. 344:17–18; Tr. 356:6–23.  Fodera observed Claud with a "destroyed" "sense of self."  *See* Tr. 366:10–12.

In addition to the clinically significant impacts of BHSH's actions on Claud's mental and physical health, there is another effect of her wrongful termination that is more difficult to quantify but nonetheless significant. BHSH's actions deprived Claud of her dream to build a real estate career in the community where she grew up and where her close-knit extended family continues to live. After making valiant efforts to restart her once-promising career in the Hamptons real estate industry for many months without success, Claud quite reasonably concluded that doing so was futile and unsustainable.  As Claud summed up: "They took everything from me that I worked for."  Tr. 172:6–7.  Claud eventually reapplied to college and was accepted into a program seven hours away from Southampton, where she completed her degree in finance.  Tr. 171:5–10.  Now enrolled in a master's degree program, Claud lives in Atlanta, Georgia, nearly 1,000 miles away from her hometown.  *See* Tr. 45:4; Tr. 197:5–17.  Claud was effectively knocked off the professional real estate ladder she was climbing with great promise and excitement.  And part of what Claud has suffered as a result of her termination is grief over the lost opportunity to enjoy a highly fulfilling real estate career in her home community.

BHSH points to Claud's subsequent academic success as an indication that she suffered no "impediment to continuing (and improving) her life." ECF No. 66, at 27.  To this point, BHSH cited her stellar grades in her subsequent college and master's degree programs, and her participation in various clubs and activities, as evidence that she was not nearly as depressed, anxious, or non-functional as she claims.  *Id.*

I reject this contention for several reasons.  First, Claud and her treating therapist both testified that she experienced a marked decline in

functioning in the immediate wake of her wrongful termination—suffering from insomnia, a lack of interest in her usual activities, feelings of shame and worthlessness, and hypervigilance, among other things.  That is a significant and compensable injury, regardless of whether her condition improved in the years to come.  Second, the fact that Claud demonstrated notable resilience and grit in the face of her wrongful termination by returning to school and doing well academically does not preclude a finding that she *also* continued to suffer significant emotional distress which continues to this day.  Many people who suffer substantial trauma continue to outwardly function well in society and find meaning and purpose in their lives—even while continuing to experience emotional distress and related symptoms.[22]  If anything, the fact that Claud has had early success in forging an alternate path after her wrongful termination is yet another indication as to what she might have achieved in her original chosen field, had BHSH not suddenly cut it short in retaliation for the exercise of her civil rights.

For each of these reasons, the trial record establishes that she suffered far more than "garden variety" emotional distress.  However, without minimizing the harms Claud has experienced, courts have continued to reserve findings of "egregious" emotional distress damages for plaintiffs who have been subjected to permanent physical or mental changes in lifestyle— changes that Claud, to her credit, appears to have worked through via ongoing treatment.  *See Sooroojballie*, 816 F. App'x at 547–48 (collecting cases).  Her specific descriptions and corroborated testimony, however,

---

[22] Research suggests that "people exposed to trauma for various reasons may be able to function within normal limits" while "suffer[ing] from significant distress and internal conflict."  *See* Brett T. Litz, *Resilience in the Aftermath of War Trauma: A Critical Review and Commentary*, 4 INTERFACE FOCUS, no. 5, 2014, at 8,  http://dx.doi.org/10.1098/rsfs.2014.0008 [https://perma.cc/F43J-39P4]; *see also* Kenya Anderson, *#MeToo Founder Tarana Burke on Working Through Trauma to Create Joy*, VICE (Sept. 11, 2018), https://www.vice.com/en/article/mbwqxp/metoo-founder-tarana-burke-on-working-through-trauma-to-create-joy [https://perma.cc/QK5A-J25C] (interview with award-winning author and activist Tarana Burke, a sexual assault survivor, discussing strategies for balancing persisting effects of trauma with countervailing emphasis on "resilience" and "joy").

distinguish her claims from those courts have deemed "garden variety."

While "[t]here is no objective way to assign any particular dollar value to distress," courts should ensure awards are "fair, reasonable, predictable, and proportionate." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 205 (2d Cir. 2014). This means that an award may exceed ranges from prior cases to reflect the harms a particular plaintiff has experienced.

Although some courts' awards for significant emotional distress in this circuit have ranged from $50,000 to $200,000, others have been higher. *See, e.g.*, *Emamian v. Rockefeller Univ.*, No. 07 CIV. 3919 (DAB), 2018 WL 2849700, at *15–18 (S.D.N.Y. June 8, 2018) (reducing a $2 million jury award to $200,000 in light of plaintiff's manifestations of emotional suffering—including trichotillomania, or a need to pull out her own hair, and generalized anxiety disorder—and corroborative medical testimony); *Marchisotto v. City of New York*, No. 05 CIV. 2699 (RLE), 2007 WL 1098678, at *3, 11 (S.D.N.Y. Apr. 11, 2007) (finding reasonable a $300,000 award for a plaintiff whose psychologist corroborated that the plaintiff suffered from posttraumatic stress disorder, major depressive disorder, and had difficulty performing sexually), *aff'd*, 299 F. App'x 79 (2d Cir. 2008); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 363 (E.D.N.Y. 1999) (declining to find excessive a $250,000 emotional distress award for a plaintiff who testified—as corroborated by his social worker—to suffering from years of pervasive and severe sexual orientation harassment). And an award that directly tracks the cases cited above would not account for the effects of inflation in intervening years. Under the Consumer Price Index, for example, the awards in *Emamian* ($200,000 in June 2018), *Marchisotto* ($300,000 in April 2007), and *Quinn* ($250,000 in June 1999) had the same buying power as $240,775, $440,324, and $456,322, respectively, in April 2023.[23] *See CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last visited June 7, 2023).

---

[23] Permalinks for these amounts, respectively, are available at https://perma.cc/6URZ-KZVR ($200,000 in June 2018); https://perma.cc/4Y9B-Z28P ($300,000 in April 2007); and https://perma.cc/47T8-XEHD ($250,000 in June 1999).

Here, in light of all of the evidence presented at trial, and upon consideration of both persuasive and controlling authorities in this area of law, I conclude that Claud is entitled to compensatory damages for significant emotional distress in the amount of $300,000.

### c.    Interest

Claud is entitled to both pre-judgment interest on her economic damages and to post-judgment interest.

**Pre-judgment interest.** A § 1981 plaintiff is entitled to pre-judgment interest. *Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15 CV 4381 (DLI) (CLP), 2017 WL 9482107, at *24–26 (E.D.N.Y. Feb. 24, 2017), *report and recommendation adopted as modified*, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017).  Indeed, when a court awards back pay, "it is ordinarily an abuse of discretion *not* to include pre-judgment interest." *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998) (citation omitted).  Doing so prevents a defendant employer from getting an "interest-free loan for as long as it can delay paying out back wages" and helps to make a plaintiff whole. *Id.* at 874.  To this end, courts in this circuit have awarded pre-judgment interest on compensatory damages under § 1981. *See, e.g.*, *Santiago*, 2017 WL 9482107, at *24–26 (awarding pre-judgment interest in a § 1981 case); *Jowers*, 2006 WL 1408671, at *11 (same).

"No federal statute specifies the rate at which pre-judgment interest should be calculated," which means that a court has discretion to determine the applicable rate. *Barrella v. Vill. of Freeport*, 43 F. Supp. 3d 136, 194 (E.D.N.Y. 2014), *aff'd*, 814 F.3d 594 (2d Cir. 2016).  Courts in this district "traditionally use the average Treasury bill rate over the time period in question for back pay compensation." *Joseph*, 970 F. Supp. 2d at 151; *see also* 28 U.S.C. § 1961(a) (specifying the rate to use for post-judgment interest); *Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 3841970, at *2 (E.D.N.Y. Nov. 18, 2009) (applying rate from 28 U.S.C. § 1961(a) for pre-judgment interest).

To calculate pre-judgment interest, courts in this circuit have divided back pay awards evenly over the relevant time period, applied the average annual Treasury bill rate of interest from 28 U.S.C. § 1961, and then

compounded interest annually. *See, e.g.*, *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 677–78 (E.D.N.Y. 1996) (dividing $150,714 back pay award over a five-year period and then compounding interest annually); *Perdue v. City Univ. of N.Y.*, 13 F. Supp. 2d 326, 342 & n.9 (E.D.N.Y. 1998) (allocating $134,829 award proportionally over a twenty-three-month period and compounding interest annually); *Francis v. Ideal Masonry, Inc.*, No. 16-cv-2839 (NGG)(PK), 2018 WL 4292171, at *11 (E.D.N.Y. Aug. 3, 2018) (applying similar methodology), *report and recommendation adopted*, 2018 WL 4288625 (E.D.N.Y. Sept. 7, 2018); *Joseph*, 970 F. Supp. 2d at 152 (same).

Some courts have simplified this process by averaging interest rates over the relevant time period. *See, e.g.*, *Santiago*, 2017 WL 9482107, at *26 (applying the average interest rate from January 1, 2012, to February 24, 2017, to a back pay award); *Mohan v. La Rue Distributors, Inc.*, No. CV -6-0621(FB)(RLM), 2008 WL 4822266, at *4–5 (Oct. 27, 2008) (applying average of four annual average rates of return to back pay award). However, "[g]iven that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993). I thus compound interest using the average weekly interest rates for each year between the date of termination and the date of judgment.

Here, I divide the $263,516.07 back pay award across the 309.71 weeks between the date of termination and the date of judgment, which yields a prorated weekly award amount of $850.84, which I use as the principal for the interest calculations that follow.

Since BHSH terminated Claud on June 30, 2017, I determined annual interest rates by averaging the weekly interest rates for June 30 to December 31, 2017 (2.30%), 2018 (2.91%), 2019 (2.15%), 2020 (0.90%), 2021 (1.44%), 2022 (2.96%), and January 1 to June 2, 2023, the most recent date for which interest rate data was available at the time of judgment (3.60%).[24]  For 2017,

---

[24] Interest rates were calculated with data from the Federal Reserve. *See* Board of Governors of the Federal Reserve System (US), *Market Yield on U.S. Treasury Securities at 10-Year Constant Maturity, Quoted on an*

I prorated the principal by multiplying the average weekly award amount of $850.84 by the numbers of weeks (taken from the number of days divided by seven) between June 30 and December 21, 2017 (26.29 weeks); between January 1 to December 31 for 2018 (52.00 weeks), 2019 (52.00 weeks), 2020 (52.14 weeks), 2021 (52.00 weeks), and 2022 (52.00 weeks); and between January 1 to June 7, 2023  (22.43 weeks).  I then compounded interest on the accumulated principal for those time periods by adding the prorated principal for a given period to the prior period's principal plus interest.[25]  Accordingly, Claud is awarded $24,380.61 in pre-judgment interest.

**Table 1 Pre-Judgment Interest**

| Period | Principal | Weeks | Avg. Rate | Interest |
|--------|----------:|------:|----------:|---------:|
| June 30–Dec. 31, 2017 | $22,364.83 | 26.29 | 2.30% | $515.10 |
| 2018 | $67,123.40 | 52.00 | 2.91% | $1,953.14 |
| 2019 | $113,320.01 | 52.00 | 2.15% | $2,431.47 |
| 2020 | $160,116.50 | 52.14 | 0.90% | $1,445.11 |
| 2021 | $205,805.09 | 52.00 | 1.44% | $2,956.58 |
| 2022 | $253,005.14 | 52.00 | 2.96% | $7,485.28 |
| Jan. 1–June 7, 2023 | $279,573.46 | 22.43 | 3.60% | $10,062.17 |
| | | | **TOTAL** | **$24,380.61** |

---

*Investment Basis [DGS10]*, retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DGS10 [https://perma.cc/89A4-3P2U] (last visited June 5, 2023).

[25] In 2018, for instance, the principal of $67,123.40 comes from adding the prorated principal for that period ($850.84 multiplied by 52.00, or $44,243.47) to the principal plus interest for the prior period ($22,364.83 plus $515.10, or $22,879.93).  Multiplying the average weekly interest rate for that period (2.91%) by the $67,123.40 principal equals interest of $1,953.14.

**Post-judgment interest.** "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). "The interest is calculated daily and compounded annually" according to the average one-year constant maturity Treasury yield, as described above. *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 662 (2d Cir. 2020) (citing 28 U.S.C. § 1961(a)–(b)). The amount upon which the post-judgment interest accrues "includes compensatory damages, punitive damages, and fee awards." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 102 (E.D.N.Y. 2020) (citation omitted). Indeed, a post-judgment interest award serves to "compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 55 (2d Cir. 1998) (citations omitted). The Clerk of Court is respectfully directed to calculate post-judgment damages from the date of the entry of judgment.

## 2.   Punitive damages

Punitive damages serve to punish a defendant for its conduct and deter both the defendant and others from similar future conduct. *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992). Courts have awarded punitive damages under § 1981 when an "employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 75 (E.D.N.Y. 2002), *aff'd*, 93 F. App'x 260 (2d Cir. 2004). "[U]nlike Title VII, Section 1981 does not have a statutory cap that limits punitive damages." *Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220 (E.D.N.Y. 2007) (citations omitted).

"A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive." *Saleh v. Pretty Girl, Inc.*, No. 09-CV-1769 (RER), 2022 WL 4078150, at *25 (E.D.N.Y. Sept. 6, 2022) (quoting *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005)). To ensure that a punitive damages award does not violate due process, a court looks to (1) "the degree of reprehensibility of the defendant's conduct," followed by (2) "the ratio [of

punitive damages] to the actual harm inflicted on the plaintiff"; and (3) the comparison between the punitive damages award and the "civil or criminal penalties that could be imposed for comparable misconduct." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 575, 580, 583 (1996).

Claud argues that a discretionary award of punitive damages is warranted here because, among other reasons, she was subject to reprehensible conduct when BHSH fired her just two weeks after complaining of discrimination, and because lacked any sort of anti-discrimination policies to provide guidance and protection to agents in her position.  ECF No. 65, at 14.

BHSH's conduct was indeed reprehensible.  As noted above, its senior executives seized on a pretextual reason for firing Claud, did so in a callous and unceremonious fashion, and repeatedly gave what I found to be false testimony about their own actions and the reasons for Claud's termination. In addition, I agree with Claud that punitive damages are in part justified for purposes of deterrence, both as to BHSH and other firms in the real estate industry.  Among other things, an award of punitive damages may serve to deter BHSH and comparable firms from retaliating against employees who, like Claud, have the courage to raise good-faith claims of racial discrimination with management.  Such an award may also incentivize those firms to adopt clear policies and practices that inform agents and other employees of their legal rights to be free from discrimination, and how they may exercise those rights without fear of unlawful retaliation.

 I find that an award of $200,000 in punitive damages is appropriate here.  Such an award corresponds to the degree of reprehensibility in BHSH's conduct, is not excessive at a ratio of compensatory damages to punitive damages of nearly 3 to 1 and may serve to deter future misconduct.

## CONCLUSION

In June 2017, Brown Harris Stevens of the Hamptons suddenly and callously cut short the highly promising career of a young real estate agent who was, at the time, the only Black person in a comparable role at the entire firm.  BHSH gave Shauncy Claud no explanation for her sudden termination, and its actions deprived her of any viable path to pursue her dream of a

career as a real estate agent in the community where she was born and raised.

BHSH took this action in direct retaliation against Claud for making a good-faith request for assistance just two weeks earlier to the firm's senior executive manager, in which Claud reported what she believed was a pattern of unfair and disparate treatment based on race by her direct supervisor over many months. Claud took this action only after making repeated efforts to address the situation informally with her supervisor and others. She left the meeting believing that these issues would be addressed, and she might finally get the same mentorship, supervision, and level playing field at work as other agents. She was wrong. And when Claud filed suit for wrongful termination, BHSH gave non-credible and inconsistent explanations for its actions, all of which established that its proffered reason for firing Claud two weeks after her discrimination complaint was a mere pretext.

Such conduct is expressly forbidden by § 1981. Six years later, Claud cannot get her once-promising real estate career back. But she is entitled to recover damages to compensate her for the substantial economic and non-economic harm that BHSH caused. In addition, BHSH's conduct was sufficiently reprehensible and in need of deterrence that an additional award of punitive damages is appropriate. In total, I find that Claud is entitled to an award of damages in the amount of $787,896.68, with post-judgment interest.

**Table 2 Summary of Damages**

| Category | | Amount |
| --- | --- | --- |
| **Compensatory Damages** | | **$587,896.68** |
| Economic damages: Back pay | | $263,516.07 |
| Non-economic (emotional distress) damages | | $300,000.00 |
| Pre-judgment interest | | $24,380.61 |
| **Punitive damages** | | **$200,000.00** |
| | **Total** | **$787,896.68** |

The Clerk of Court is respectfully directed to enter judgment against BHSH in these amounts and to calculate post-judgment interest.

The parties shall confer as to a briefing schedule for any application for attorney's fees that Plaintiff may seek.

SO ORDERED.

_/s/ NRM_
NINA R. MORRISON
United States District Judge


Dated:    June 7, 2023
          Brooklyn, New York